# IN THE SUPREME COURT OF TEXAS

════════════

No. 11-0332

════════════

ROBERT MASTERSON, MARK BROWN, GEORGE BUTLER, CHARLES
WESTBROOK, RICHEY OLIVER, CRAIG PORTER, SHARON WEBER, JUNE SMITH,
RITA BAKER, STEPHANIE PEDDY, BILLIE RUTH HODGES, DALLAS CHRISTIAN,
AND THE EPISCOPAL CHURCH OF THE GOOD SHEPHERD, PETITIONERS,

v.

THE DIOCESE OF NORTHWEST TEXAS, THE REV. CELIA ELLERY,
DON GRIFFIS, AND MICHAEL RYAN, RESPONDENTS

════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

════════════════════════════════════════════════════════

**Argued October 16, 2012**


JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE
GREEN, JUSTICE GUZMAN, and JUSTICE DEVINE joined, and in parts I, II, III-A, and V of which
JUSTICE WILLETT and JUSTICE BOYD joined.

JUSTICE BOYD filed a concurring opinion, in which JUSTICE WILLETT joined.

JUSTICE LEHRMANN filed a dissenting opinion, in which CHIEF JUSTICE JEFFERSON joined.


The question before us is what happens to the property when a majority of the membership

of a local church votes to withdraw from the larger religious body of which it has been a part. In this

case, title to property of the local church is held by a Texas non-profit corporation originally named

The Episcopal Church of the Good Shepherd (corporation or Good Shepherd). The corporation was

formed as a condition of Good Shepherd's congregation being accepted into union with the Episcopal Diocese of Northwest Texas (Diocese). When members of the congregation became divided over doctrinal positions adopted by The Episcopal Church of the United States (TEC), a majority of the parishioners voted to amend Good Shepherd's articles of incorporation and bylaws to withdraw Good Shepherd from communion with TEC and the Diocese and revoke any trusts on the corporation's property in favor of those entities. The corporation and the withdrawing faction of parishioners maintained possession of the property.

The Diocese and leaders of the faction of parishioners loyal to the Diocese and TEC filed suit seeking title to and possession of the property. The trial court eventually granted summary judgment in favor of the loyal faction. The court of appeals affirmed.

The first issue we confront is the legal methodology to be applied. At least two are permissible under the First Amendment to the United States Constitution: "deference" and "neutral principles of law" (neutral principles). The court of appeals held that Texas courts may use either. We conclude that greater predictability in this area of the law will result if Texas courts apply only one methodology. We also conclude that the neutral principles methodology should be applied because it better conforms to Texas courts' constitutional duty to decide disputes within their jurisdiction while still respecting limitations the First Amendment places on that jurisdiction. Under the neutral principles methodology, courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, *Jones v. Wolf*, 443 U.S. 595, 603-04 (1979), while deferring to religious entities' decisions on ecclesiastical and church polity questions. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708 (1976).

Applying neutral principles of law to the record before us, we conclude that the trial court erred by granting summary judgment and the court of appeals erred by affirming. We reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

## I. Background

### A. Episcopal Good Shepherd

In 1961 individuals purchased a tract of land in San Angelo (1961 tract) and donated it to the Northwest Texas Episcopal Board of Trustees (Trustees). The donation was for the purpose of establishing a mission church. In 1965 a group of worshipers filed an application with the Diocese to organize a mission to be named "The Episcopal Church of the Good Shepherd" (the Church). The Diocese eventually approved the application and TEC made loans and grants to the Church to assist its growth. The bishop of the Diocese ultimately approved plans for a building, presided over the groundbreaking ceremony, then formally dedicated the building. In 1969 individuals purchased another tract of land (1969 tract) that was adjacent to the 1961 tract and donated it to the Trustees.

In March 1974 the Church applied to the Diocese for parish status. It was formally accepted into union with the Diocese at the Diocese's annual convention in April 1974. That same year, in conformance with canons of the Diocese which required parishes to be corporations, the Church incorporated under the Texas Non-Profit Corporations Act. *See* TEX. REV. CIV. STAT. art. 1396. The corporation's bylaws provided that the corporation would be managed by a Vestry elected by

members of the parish.[1] The bylaws prescribed qualifications for voting at parish meetings[2] and specified that amendments to the bylaws would be by majority vote.[3]

In 1982 the Trustees conveyed the 1961 and 1969 tracts to the corporation by warranty deed. In 2005 two individuals sold a tract of land (the 2005 tract) to Good Shepherd. The tract was conveyed to the corporation by warranty deed with a vendors lien to secure a purchase-money note executed by the corporation. Neither the 1982 deed from the Trustees nor the 2005 deed provided for or referenced a trust in favor of TEC or the Diocese.

## B. Schism

Due to doctrinal differences with TEC, some members of the parish proposed disassociating from TEC and organizing as an independent church under the name "Anglican Church of the Good Shepherd" (withdrawing faction). The parish held a called meeting on November 12, 2006, during

---

[1] Article VI of the Articles of Incorporation addressed election of the Vestry:

Article VI

The number of vestrymen constituting the initial vestry of the corporation is nine . . . .
The vestrymen named in these Articles of Incorporation as the first vestry of the Episcopal Church of the Good Shepherd shall hold office in accordance with the Church Canons until the expiration of their duly elected terms of office. At the expiration of the term of office of each member of the vestry, successors will be elected at the annual meeting of the members of the parish with the duly elected vestry-men serving in staggered terms of three years each.

[2] Those qualified to vote at Parish meetings were "communicants of the Parish, as shown on the Parish register, who are at least sixteen (16) years of age and are baptized members of the congregation who are regular contributors as shown by the Treasurer's records."

[3] Provisions for amending the bylaws were as follows:

These By-Laws may be amended at an Annual Parish Meeting or at a special meeting called for that purpose by a majority vote of the duly qualified voters of the Parish. Notice of the proposed amendments shall be given to all qualified voters in writing at least thirty (30) days before such meeting. A majority vote of the duly qualified voters of the Parish will be necessary to approve an amendment to these By-Laws.

4

which four resolutions were presented. The resolutions were to (1) amend the corporate bylaws to, among other changes, remove all references to TEC and the Diocese; (2) withdraw the local congregation's membership in and dissolve its union with TEC and the Diocese; (3) revoke any trusts that may have been imposed on any of its property by TEC, the Diocese, or the Trustees; and (4) form a new church named Anglican Church of the Good Shepherd and change the name of the corporation to that name. The resolutions passed by a vote of 53 to 30. The stated effective date of the vote was January 5, 2007. Amended articles of incorporation changing the corporate name to Anglican Church of the Good Shepherd were then filed. *See* TEX. BUS. ORGS. CODE §§ 3.052–.053, 22.106 (providing procedures for amending certificate of formation of a non-profit corporation).

After the parish vote, but before the effective date, the Diocese's Bishop, Rev. Wallis Ohl, took the position that Good Shepherd could not unilaterally disassociate from the Diocese and that the vote did not have any effect on Good Shepherd's relationship with the Diocese or TEC. He held a meeting with the faction of the parish loyal to TEC and the Diocese and appointed Rev. Celia Ellery as Priest-in-Charge of the Parish. Under the leadership of Rev. Ellery, the loyal faction elected a vestry and was recognized by Bishop Ohl as the "continuing Episcopal Parish operating Good Shepherd."

The withdrawing faction continued to use the parish property, so two vestry members of the loyal faction together with Rev. Ellery and the Diocese (collectively, Episcopal Leaders) filed suit against leaders of the withdrawing faction and the Good Shepherd corporation (collectively, Anglican Leaders). The Episcopal Leaders sought a declaratory judgment that (1) Good Shepherd's

5

property could not be alienated or used by the Anglican Leaders for any purpose other than the mission of TEC; (2) the continuing Parish of the Good Shepherd was represented by those persons recognized by the Bishop as the loyal faction; (3) the actions of the Anglican Leaders in seeking to sever ties between Good Shepherd, the Diocese, and TEC were void; and (4) all the parish property was held in trust for TEC and the Diocese and the Episcopal Leaders were entitled to possess and control it.[4]  In their pleadings the Episcopal Leaders based their claim to the property on the allegation that: "According deference to the Bishop, Plaintiffs assert that they are entitled to title, possession and use of all real and personal property belonging to the GOOD SHEPHERD, including the CHURCH PREMISES."

The Anglican Leaders answered and filed a counterclaim seeking  judgment quieting title to the property in the Anglican Church of the Good Shepherd, a Texas non-profit corporation, and removing any cloud to the title created by the Episcopal Leaders' claims.  The Anglican Leaders asserted that under Texas law the non-profit corporation held unencumbered title to the property; the individual Anglican Leaders had been elected as the corporation's vestry in accordance with the corporate Articles of Incorporation and bylaws; the Episcopal Leaders had no right or authority to act on behalf of the corporation; and the Episcopal Leaders' claims were barred by statutes of frauds. *See* TEX. BUS. & COM. CODE § 26.01; TEX. PROP. CODE §112.004.

The Episcopal Leaders moved for summary judgment.  They asserted that TEC is a hierarchical church; its Canons and rules provide that all property of a Parish is held in trust for use

---

[4] The Episcopal Leaders also sought an accounting for funds and personal property of the Parish being held by defendants and damages for conversion of Parish personal property and funds.  Those claims were non-suited before summary judgment was granted.

of TEC and the respective Diocese; when congregations of hierarchical churches split, Texas courts defer to the decisions of the church's superior hierarchical authority as to which faction comprises the true church; the members loyal to TEC have been recognized by the Diocese's Bishop as the true church; and the parish property is held in trust for TEC and the Diocese. In both their motion and reply to the Anglican Leaders' response, the Episcopal Leaders maintained that "[t]he sole legal issue is whether or not the Episcopal Church is hierarchical." They did not plead or assert as grounds for summary judgment that they were entitled to the property on the grounds that application of neutral principles of law mandated summary judgment in their favor, although in reply to the Anglican Leaders' response to their motion for summary judgment, the Episcopal Leaders argued that they were entitled to the property under both deference and neutral principles analyses.

The trial court granted the Episcopal Leaders' motion. It made several findings in its order, including a finding that TEC is a hierarchical church. The court declared and ordered that (1) "the continuing Parish of the Good Shepherd is identified as and represented by those persons recognized by the Bishop of the [Diocese]"; (2) the actions of the Anglican Leaders in seeking to withdraw Good Shepherd as a Parish of the Diocese and from TEC were void; (3) the Anglican Leaders could not "divert, alienate, or use" Parish property except for the mission of TEC; and (4) all the property of Good Shepherd is held in trust for TEC and the Diocese. The court ordered the Anglican Leaders to relinquish control of the property to the Vestry of the faction recognized by Bishop Ohl as The Episcopal Church of the Good Shepherd.

The Anglican Leaders appealed and the court of appeals affirmed. 335 S.W.3d 880. It held that Texas courts may analyze disputes such as these under either the deference or neutral principles

7

methodologies. It analyzed the case under both and reached the same conclusion: the summary judgment should be affirmed. *Id.* at 892. The appeals court concluded that when the withdrawing faction voted to disaffiliate from TEC, the vote was only effective as to those parishioners who withdrew and who were free to join the Anglican community; the vote did not withdraw Good Shepherd itself from TEC, and therefore, the church property remained under the authority and control of TEC. *Id.* at 892-93.

In this Court the Anglican Leaders primarily argue that the proper approach to dealing with church property disputes in Texas is the neutral principles methodology because that methodology, at bottom, simply allocates decisions to the proper forum: ecclesiastical decisions are made by the church and secular decisions are made by courts. They urge that the court of appeals' classification of this dispute as an inherently ecclesiastical question of identity—*i.e.*, which parishioners comprise the continuing Episcopal parish—ignores the fact that there is a Good Shepherd non-profit corporation controlled by its members; the Bishop of the Diocese has no authority to determine affairs of the corporation, including who its members are and who comprises its Vestry; a majority of those qualified to vote in corporate matters voted to amend the corporate governing documents and disassociate the corporation from the Diocese and TEC; and under Texas law and the corporate bylaws the majority vote prevails. Not wanting to put all their eggs in the neutral principles basket, the Anglican Leaders also argue that even if the case is analyzed under the deference approach, the judgment of the court of appeals must be reversed. They assert that the deference approach is predicated on a church organization having superior ecclesiastical tribunals with control over the specific dispute, and because neither TEC nor the Diocese have such tribunals, there is no basis to

8

afford deference to decisions of either of those entities. Finally, the Anglican Leaders contend that the effect of the court of appeals' decision is to deny the right of a non-profit corporation to withdraw from an association with another entity when the corporate documents do not preclude its doing so, a majority of its voting members desire to do so, and its elected leadership desires to do so. That, they argue, violates its rights under the First Amendment to the United States Constitution.

The Episcopal Leaders respond that Good Shepherd is bound by the Canons and Constitution of TEC because Episcopal Good Shepherd is and always has been part of TEC's hierarchical structure. They argue that the only question to be decided by civil courts is the identity of the body of believers comprising the true faction continuing Episcopal Good Shepherd, and that question must be answered by deferring to the decision of TEC and the Diocese because it is a matter of church polity and administration. They urge that in the past Texas has embraced the "identity" approach to church property disputes involving hierarchical churches and should continue to do so. As do the Anglican Leaders, the Episcopal Leaders offer an alternative argument. They say that even under a neutral principles analysis, the judgment of the court of appeals should be affirmed because the Constitution, Canons, and other rules of TEC and the Diocese provide that the property is held in trust for TEC and the Diocese.

Because arguments of the parties reference the organizational structure of TEC, we briefly review it.

### C. Organizational Structure

TEC is a religious denomination founded in 1789. It has three tiers. The first and highest is the General Convention. The General Convention consists of representatives from each diocese and

most of TEC's bishops.  It adopts and amends TEC's Constitution and Canons, which establish the structure of the denomination and rules for how it operates.  Each subordinate Episcopal affiliate must accede to and agree to be subject to the TEC Constitution and Canons.

The second tier is comprised of regional, geographically defined dioceses.  Dioceses have bishops and are governed by their own conventions.  Diocesan conventions adopt and amend a constitution and canons for each particular diocese.

The third tier is comprised of local congregations.  Local congregations are classified as parishes, missions, or congregations.  To be accepted into union with TEC they must accede to and agree to be subject to the constitutions and canons of both TEC and the diocese in which the congregation is located.

This case involves a parish.  A parish is governed by a rector or priest-in-charge and a vestry comprised of lay persons elected by the parish members.  Members of the vestry must meet certain qualifications, including committing to "conform to the doctrine, discipline and worship of The Episcopal Church."

## II.  Who Decides What

Good Shepherd corporation's bylaws prescribe who can vote when vestry members are elected, how the corporation's vestry is elected, who can vote on proposed amendments to the bylaws, and how the bylaws and articles of incorporation are amended.  The essential issue presented is whether either (1) the decision by Bishop Ohl to recognize the Episcopal Leaders and the loyal faction as the vestry and members of the continuing Good Shepherd Parish served to establish those vestry members as the vestry of the corporation and the loyal faction as the voters entitled to vote on

10

corporate matters when neither the articles of incorporation nor the bylaws afforded him that authority; or (2) his decision determined who was entitled to the corporation's property regardless of the decisions of elected leaders of the corporation and persons specified by the corporate bylaws as qualified to vote on corporate affairs.  In addressing the issue we are guided by two principles.  The first is that a court has no authority to decide a dispute unless it has jurisdiction to do so.  *See, e.g.*, *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 309 (Tex. 2010).  The second is that Texas courts are bound by the Texas Constitution to decide disputes over which they have jurisdiction, and absent a lawful directive otherwise they cannot delegate or cede their judicial prerogative to another entity. *See Morrow v. Corbin*, 62 S.W.2d 641, 645 (1933) ("We are equally clear that the power thus confided to our trial courts [by the Constitution] must be exercised by them as a matter of nondelegable duty, that they can neither with nor without the consent of parties litigant delegate the decision of any question within their jurisdiction, once that jurisdiction has been lawfully invoked, to another agency or tribunal.") (citations omitted).

### A.  Jurisdiction In Church Property Disputes

The Free Exercise clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I.  The clause "severely circumscribes the role that civil courts may play in resolving church property disputes," *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969), by prohibiting civil courts from inquiring into matters concerning "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them.'"  *Milivojevich*, 426 U.S. at 713-14 (quoting

11

*Watson v. Jones*, 80 U.S. 679, 733 (1872)). The First Amendment is applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

Attempts by courts to resolve church property disputes while balancing the competing interests of property rights and the First Amendment's Free Exercise provision have resulted in two general approaches to the issue. They are typically referred to as the "neutral principles of law" approach and the "deference" or "identity" approach. *See, e.g.*, *Jones v. Wolf*, 443 U.S. 595, 602-10 (1979) (discussing both approaches to church property disputes). The First Amendment does not require states to follow a particular method of resolving church property disputes; rather, "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.* at 602 (citing *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (Brennan, J., concurring)) (emphasis in original).

## 1. Deference

The Supreme Court recently elaborated on its decision in *Watson*, which is often cited as the seminal case regarding the "deference" or "identity" approach in church property dispute cases:

> In [*Watson*], the Court considered a dispute between antislavery and proslavery factions over who controlled the property of the Walnut Street Presbyterian Church in Louisville, Kentucky. The General Assembly of the Presbyterian Church had recognized the antislavery faction, and this Court—applying not the Constitution but a "broad and sound view of the relations of church and state under our system of laws"—declined to question that determination. *Id.* at 727. [The Court] explained that "*whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.*" *Ibid*. As [the Court] would put it later, [the] opinion in *Watson* "radiates . . . a spirit of freedom for religious organizations, an independence from

12

secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952).

*Hosana-Tabor Evangelical Lutheran Church and School v. Equal Emp't Opportunity Comm'n*, ___ U.S. ___, 132 S.Ct. 694, 704 (2012) (emphasis added); *see also Jones*, 443 U.S. at 602. The deference approach embodies this general principle. A court applying the deference approach defers to and enforces the decision of the highest authority of the ecclesiastical body to which the matter has been carried. *See Jones*, 443 U.S. at 604-05.

While the deference approach is based on principles set forth in *Watson*, *Watson* itself clarified that the First Amendment does not require a court to forego application of secular legal principles when resolving church property disputes:

> Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints. Conscious as we may be of the excited feeling engendered by this controversy, . . . we enter upon its consideration with the satisfaction of knowing that the principles on which we are to decide so much of it as is proper for our decision, are those applicable alike to all of its class, and that our duty is the simple one of applying those principles to the facts before us.

80 U.S. at 714. As the Court elaborated in *Presbyterian Church v. Blue Hull Memorial Church*, 393 U.S. 440, 449 (1969) and in *Jones*, "deference" is not a choice where ecclesiastical questions are at issue; as to such questions, deference is compulsory because courts lack jurisdiction to decide ecclesiastical questions. 443 U.S. at 602-03, 605. But when the question to be decided is not ecclesiastical, courts are not deprived of jurisdiction by the First Amendment and they may apply another Constitutionally acceptable approach. *Id.*

13

## 2. Neutral Principles

In *Jones v. Wolf* the Supreme Court approved the neutral principles methodology as constitutionally permissible. 443 U.S. at 604. *Jones* concerned the Vineville Presbyterian Church, which was incorporated under Georgia law and was a member church of the Augusta-Macon Presbytery of the Presbyterian Church in the United States (PCUS). The PCUS maintained a hierarchical form of government. *Id.* at 597-98. Under the PCUS polity, the actions of local churches were subject to review and control by higher church courts. *Id.* at 598. The powers and duties of each level of the church hierarchy were set out in the PCUS constitution, the Book of Church Order. *Id.*

At a 1973 meeting, the Vineville Church's pastor and a majority of its members voted to separate from the PCUS and unite with the Presbyterian Church in America. *Id.* The Augusta-Macon Presbytery of the PCUS concluded that the minority faction remaining loyal to the PCUS constituted "the true congregation of Vineville Presbyterian Church." *Id.* The Presbytery then withdrew "all authority to exercise office derived from the PCUS" from the majority faction and the minority sued in state court to establish their right to exclusive possession of the church property. *Id.* at 598-99. The trial court granted judgment for the majority. The Georgia Supreme Court affirmed, rejecting the minority faction's First Amendment challenge and holding that the trial court had correctly applied neutral principles of law. *Id.* at 599.

The United States Supreme Court affirmed. It held that the methodology employed by the Georgia courts was not constitutionally infirm. *Id.* at 600 (*citing Carnes v. Smith*, 222 S.E.2d 322 (Ga. 1976), *cert. denied*, 429 U.S. 868; *Presbyterian Church v. E. Heights*, 167 S.E.2d 658, 658-60 (Ga. 1969) (*Presbyterian II*), *cert. denied*, 429 U.S. 868). Under the neutral principles methodology,

14

ownership of disputed property is determined by applying generally applicable law and legal principles. That application will usually include considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and by laws, if any), and relevant provisions of governing documents of the general church. *E.g.*, *Jones*, 443 U.S. at 602-03; *see Presbyterian II*, 167 S.E.2d at 659-60. The Court held that the First Amendment precluded neither application of neutral principles of law nor a state's adopting a presumptive rule of majority rule. *Jones*, 443 U.S. at 604, 607. It noted that "any rule of majority representation can always be overcome, under the neutral-principles approach, either by providing in the corporate charter or the constitution of the general church, that the identity of the local church is to be established in some other way . . . [such as] by providing that the church property is held in trust for the general church and those who remain loyal to it[,]" or any other method that "does not impair free-exercise rights or entangle the civil courts in matters of religious controversy." *Id.* at 607-08.

Since the identity of the local Vineville congregation was a matter of state law, the Supreme Court remanded the case to the Georgia Supreme Court. On remand the Georgia Supreme Court held that Georgia applies the presumptive majority rule to church identity and nothing in Georgia's statutes or the relevant corporate charters, deeds, and organizational constitutions of the denomination rebutted that presumption "as to the right to control the actions of the titleholder." *Jones v. Wolf*, 260 S.E.2d 84, 85 (Ga. 1979).

### B. Texas

In *Brown v. Clark*, this Court addressed a dispute similar to both the one the Supreme Court addressed in *Jones* and the one now before us. 116 S.W. 360 (Tex. 1909). In that case, property had

15

been conveyed by general warranty deed to "trustees named for the Cumberland Presbyterian Church [of Jefferson, Texas]." *Id.* at 361. The dispute in the local church arose following a vote by the majority of the presbyteries of the General Assembly of the Cumberland Presbyterian Church and the General Assembly of the Presbyterian Church of the United States of America to reunite as one church. *Id.* at 362. This Court described the schism in the Jefferson church and resulting lawsuit as follows:

> There was at all times a strong minority which opposed the reunion, and, when the General Assembly of the Cumberland Presbyterian Church adopted the report and declared the union completed, the dissenting commissioners in attendance upon that General Assembly held a meeting, and organized another General Assembly of the Cumberland Presbyterian Church. Much dissatisfaction prevailed in the churches of the Cumberland Presbyterian, and in the church at the city of Jefferson, Tex., there was a difference of opinion upon the subject of reunion among its members. Those who opposed the reunion instituted this action, claiming that they constituted the session of the Cumberland Presbyterian Church at Jefferson. The defendants in the action claimed to be the session of the Presbyterian Church of the United States of America, and were in possession of the property, and claimed that by the union the property had been transferred to the Presbyterian Church of the United States of America. The case was tried before the judge without a jury, and a judgment was rendered in favor of the defendants-those who claimed under the Presbyterian Church of the United States of America. The Court of Civil Appeals of the Sixth Supreme Judicial District reversed that judgment, and rendered judgment in favor of the plaintiffs below.

*Id.*

The principal issues presented were whether the General Assembly of the Cumberland Church had authority to reunite the Cumberland Church with the Presbyterian Church, and if so, how did the reunion affect the church property in Jefferson? *Id.* at 363-64. The Court held that the first issue was within the exclusive jurisdiction of the General Assembly because it was the highest court of the church, it had decided the question, and thus "there is no ground for action by this court." *Id.* at 364.

16

As to the second issue, the Court noted that the question of how the reunion affected the property was "perhaps the only question in the case" over which it had jurisdiction. *Id.* As opposed to the first issue, which presented no basis on which the Court could consider the merits or take action, the Court addressed the merits of the second:

> The deed for the property was made to the trustees of the Cumberland Presbyterian Church at Jefferson, Tex. It expressed no trust nor limitation upon the title. The property was purchased by the church and paid for in the ordinary way of business, and there is not attached to that property any trust either express or implied. *It follows, we think, as a natural and proper conclusion, that the church to which the deed was made still owns the property, and that whatever body is identified as being the church to which the deed was made must still hold the title.* The Cumberland Presbyterian Church at Jefferson was but a member of and under the control of the larger and more important Christian organization, known as the Cumberland Presbyterian Church, and the local church was bound by the orders and judgments of the courts of the church. *Watson v. Jones*, 13 Wall. 727, 20 L. Ed. 666. The Jefferson church was not disorganized by the act of union. It remained intact as a church, losing nothing but the word 'Cumberland' from its name. Being a part of the Cumberland Presbyterian Church, the church at Jefferson was by the union incorporated into the Presbyterian Church of the United States of America. The plaintiffs in error and those members who recognize the authority of the Presbyterian Church of the United States of America are entitled to the possession and use of the property sued for.

*Id.* at 364-65 (emphasis added). *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (noting that the opinion of a court without jurisdiction is advisory to the extent it addresses issues other than the jurisdictional issue because the Texas Constitution does not authorize courts to make advisory decisions or issue advisory opinions); *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 517 n.15 (Tex. 1995).

17

Courts of appeals have read *Brown* as applying a deference approach, and generally have applied deference principles to hierarchical church property dispute cases.[5] It is true that in *Brown* the Court determined it lacked jurisdiction over the ecclesiastical questions of whether the doctrines of the two general churches were dissimilar and whether their merger was proper. But it did not simply defer to the ecclesiastical authorities with regard to the property dispute. Instead, the Court addressed the merits of the title question by examining the deed using principles of Texas law. It concluded that the deed transferred the property to trustees of the local church that was a subordinate part of the merged Presbyterian Church of the United States of America, thus the believers recognizing the authority of that body were entitled to possession and use of the property. *Brown*, 116 S.W. at 365.

The method by which this Court addressed the issues in *Brown* remains the appropriate method for Texas courts to address such issues. Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers. But Texas courts are bound to exercise jurisdiction

_____

[5] *See Green v. Westgate Apostolic Church*, 808 S.W.2d 547, 552 (Tex. App.—Austin 1991, writ denied) ("Where a congregation of a hierarchical church has split, those members who renounce their allegiance to the church lose any rights in the property involved and the property belongs to the members who remain loyal to the church. It is a simple question of identity."); *Templo Ebenezer, Inc. v. Evangelical Assemblies, Inc.*, 752 S.W.2d 197, 198 (Tex. App.—Amarillo 1988, no writ); *Schismatic & Purported Casa Linda Presbyterian Church in Am. v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 706-07 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (applying the deference rule); *Presbytery of the Covenant v. First Presbyterian Church*, 552 S.W.2d 865, 871-72 (Tex. Civ. App.—Texarkana 1977, no writ) (determining that the question of which faction of a congregation that is part of a hierarchical religious body is entitled to church property is a question of identity answered by which faction is recognized by the higher, more important religious body); *Browning v. Burton*, 273 S.W.2d 131, 135 (Tex. Civ. App.—Austin 1954, writ ref'd n.r.e) ("[T]he right to sell the property must come from the members of the religious organization in whom the beneficial title is vested or as the laws of that group may direct."); *see also Church of God in Christ, Inc. v. Cawthon*, 507 F.2d 599, 602 (5th Cir. 1975) (discussing Texas law) ("Here the national church is a party and, as a church of the hierarchical polity, has established its right to possession and control.").

vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists. Properly exercising jurisdiction requires courts to apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues. Thus, courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved.

We recognize that differences between ecclesiastical and non-ecclesiastical issues will not always be distinct, and that many disputes of the type before us will require courts to analyze church documents and organizational structures to some degree. Further, deferring to decisions of ecclesiastical bodies in matters reserved to them by the First Amendment may, in some instances, effectively determine the property rights in question. *See Milivojevich*, 426 U.S. at 709-10; *Brown*, 116 S.W. at 364-65. Nevertheless, in our view the neutral principles methodology simply requires courts to conform to fundamental principles: they fulfill their constitutional obligation to exercise jurisdiction where it exists, yet refrain from exercising jurisdiction where it does not exist. The neutral principles methodology also respects and enforces the manner in which religious entities and their adherents choose to structure their organizations and their property rights in the same manner as those structures and rights are respected and enforced for other persons and entities.

We join the majority of states[6] that have considered the matter. We hold that Texas courts should use the neutral principles methodology to determine property interests when religious organizations are involved. Further, to reduce confusion and increase predictability in this area of the law where the issues are difficult to begin with, Texas courts must use only the neutral principles construct.

## III. Discussion

### A. Summary Judgment

The Episcopal Leaders filed a traditional motion for summary judgment on the basis that (1) TEC is a hierarchical church; (2) when hierarchical churches split, Texas courts defer to the decisions of the superior organization in the church hierarchy as to which faction comprises the true church; (3) the members loyal to TEC have been recognized by the Diocese's Bishop as the "true and

---

[6] The parties differ on exactly which states have adopted neutral principles, and which have not. We interpret the decisions of the following state supreme courts to have adopted the basic concepts of neutral principles: *African Meth. Epis. Zion Church v. Zion Hill Meth. Church, Inc.*, 534 So.2d 224, 225 (Ala. 1988); *St. Paul Church, Inc. v. Bd. of Trs.*, 145 P.3d 541, 553 (Alaska 2006); *Ark. Presbytery v. Hudson*, 40 S.W.3d 301, 306 (Ark. 2001); *In re Episcopal Church Cases*, 198 P.3d 66, 70 (Cal. 2009); *Bishop & Diocese of Colo. v. Mote*, 716 P.2d 85, 96 (Colo. 1986); *Episcopal Church in the Diocese of Conn. v. Gauss*, 28 A.3d 302, 316 (Conn. 2011); *E. Lake Meth. Epis. Church, Inc. v. Trs.*, 731 A.2d 798, 810 (Del. 1999); *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 354 (D.C. 2005); *Rector, Wardens, Vestrymen of Christ Church in Savannah v. Bishop of Epis. Diocese*, 718 S.E.2d 237, 241 (Ga. 2011); *Gospel Tabernacle Body of Christ Church v. Peace Publishers & Co.*, 506 P.2d 1135, 1138 (Kan. 1973); *Fluker Cmty. Church v. Hitchens*, 419 So.2d 445, 447 (La. 1982); *Attorney Gen. v. First United Bapt. Church of Lee*, 601 A.2d 96, 99 (Me. 1992); *From the Heart Church Ministries, Inc. v. African Meth. Epis. Zion Church*, 803 A.2d 548, 565 (Md. 2002); *Maffei v. Roman Catholic Archbishop*, 867 N.E.2d 300, 310 (Mass. 2007); *Piletich v. Deretich*, 328 N.W.2d 696, 701 (Minn. 1982); *Schmidt v. Catholic Diocese*, 18 So.3d 814, 824 (Miss. 2009); *Presbytery of Elijah Parish Lovejoy v. Jaeggi*, 682 S.W.2d 465, 467 (Mo. 1984); *Hofer v. Mont. Dep't of Pub. Health*, 124 P.3d 1098, 1103 (Mont. 2005); *Medlock v. Medlock*, 642 N.W.2d 113, 128-29 (Neb. 2002); *Berthiaume v. McCormack*, 891 A.2d 539, 547 (N.H. 2006); *Blaudziunas v. Egan*, 961 N.E.2d 1107, 1110 (N.Y. 2011); *Harris v. Matthews*, 643 S.E.2d 566, 570 (N.C. 2007); *Serbian Orthodox Church Congregation v. Kelemen*, 256 N.E.2d 212, 216 (Ohio 1970); *In re Church of St. James the Less*, 888 A.2d 795, 805-06 (Pa. 2005); *All Saints Parish Waccamaw v. Protestant Epis. Church in Diocese of S.C.*, 685 S.E.2d 163, 171 (S.C. 2009); *Foss v. Dykstra*, 342 N.W.2d 220, 222 (S.D. 1983); *Jeffs v. Stubbs*, 970 P.2d 1234, 1250-51 (Utah 1998); *Reid v. Gholson*, 327 S.E.2d 107, 112 (Va. 1985); *Wis. Conf. Bd. of Trs. v. Culver*, 627 N.W.2d 469, 475-76 (Wis. 2001).

20

proper representatives of the Episcopal Church of the Good Shepard"; and (4) the Canons and rules of TEC and the Diocese provide that property of a parish is to be held in trust for use of TEC and the respective Diocese, thus the parish property is held in trust for TEC, the Diocese, and through them, the loyal faction. In both their motion and reply to the defendant's response, the Episcopal Leaders maintained that the Episcopal Church is heirarchical as a matter of law and the Anglican Leaders did not have authority to dissolve the relationship between Good Shepard and TEC and the Diocese.

We review the trial court's grant of summary judgment de novo. *Exxon Corp. v. Emerald Oil & Gas Co.*, 331 S.W.3d 419, 422 (Tex. 2010). To prevail on their motion, the Episcopal Leaders must have proved that, as a matter of law, they were entitled to judgment on the issues they pleaded and set out in their motion for summary judgment. *See* TEX. R. CIV. P. 166a(c).

Civil courts are constitutionally required to accept as binding the decision of the highest authority of a hierarchical religious organization to which a dispute regarding internal government has been submitted. *See Hosanna-Tabor*, ___ U.S. ___, 132 S. Ct. at 705 (*citing Milivojevich*, 426 U.S. at 708). So what happens to the relationship between a local congregation that is part of a hierarchical religious organization and the higher organization when members of the local congregation vote to disassociate is an ecclesiastical matter over which civil courts generally do not have jurisdiction. *Milivojevich*, 426 U.S. at 713-14. But what happens to the property is not, unless the congregation's affairs have been ordered so that ecclesiastical decisions effectively determine the property issue.

The Anglican Church Leaders contend that even if TEC is hierarchical, not all decisions by hierarchical religious organizations are entitled to deference regarding ecclesiastical governmental

21

matters. They argue that in order to determine whether to defer to a church tribunal's decision, civil courts should examine the church's organizational documents and evaluate whether those documents expressly vest a church tribunal with authority to decide the specific issue in question. Citing *Milivojevich*, the Anglican Church Leaders urge that the Episcopal Church has not created hierarchical tribunals with authority to remove the vestry, exclude people from membership in the local church, or to adjudicate this property dispute. But nothing in *Milivojevich* requires a hierarchical religious entity to expressly establish which powers its religious tribunals may properly exercise. To the contrary, *Milivojevich* suggests that the First Amendment limits the jurisdiction of secular courts regarding the extent to which they may inquire into the form or type of decision-making authority a religious entity chooses to utilize, the specific powers of that authority, or whether the entity has followed its own procedures regarding controversies within the exclusive jurisdiction of the ecclesiastical authorities. *See Milivojevich*, 426 U.S. at 720. Further, courts are precluded from exercising jurisdiction over matters the First Amendment commits exclusively to the church, even where a hierarchical religious organization fails to establish tribunals or specify how its own rules and regulations will be enforced. *See Hosanna-Tabor*, ___ U.S. at ___, 132 S.Ct. at 704 (*citing Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)); *Watson*, 80 U.S. at 728-30.

We agree with the court of appeals that the record conclusively shows TEC is a hierarchical organization. The Anglican Leaders do not dispute that Bishop Ohl is the highest ecclesiastical authority in the Diocese nor that he has recognized the new vestry aligned with the Episcopal Church Leaders as "the true and proper representatives of the Episcopal Church of the Good Shepherd."

22

Whether Bishop Ohl was authorized to form a parish and recognize its membership, whether he could or did authorize that parish to establish a vestry, and whether he could or did properly recognize members of the vestry are ecclesiastical matters of church governance. The trial court lacked jurisdiction over and properly deferred to Bishop Ohl's exercise of ecclesiastical authority on those questions. *See Hosanna-Tabor*, ___ U.S. at ___, 132 S.Ct. at 704; *Brown*, 116 S.W. at 363.

But although we agree with the court of appeals as to these conclusions, we disagree with its determination that the question of who owns the property is inextricably linked to or determined by them. There is a difference between (1) the Bishop's determining which worshipers are loyal to the Diocese and TEC, whether those worshipers constituted a parish, and whether a parish properly established a vestry, and (2) whether the corporation's bylaws were complied with when the vote occurred to disassociate the corporation from the Diocese and TEC. After all, the Diocese required the Church to incorporate, and the corporation has a secular existence derived from applicable Texas law and the corporation's articles of incorporation and bylaws. The Diocese did not urge as grounds for summary judgment that amendment of the bylaws and articles of incorporation was ceded to the Diocese so that whether to amend them was an ecclesiastical decision and not a secular one. Rather, the Episcopal Leaders alleged that they are entitled to the property because Bishop Ohl—after the vote to change the corporation's status took place in 2006—decided the loyal faction was the true membership of Good Shepherd, and "[a]ccording deference to the Bishop, [the Episcopal Leaders] assert that they are entitled to title, possession and use of [the property]."

The Episcopal Leaders neither pleaded nor urged as grounds for summary judgment that they are entitled to the property on the basis of neutral principles. Because the deference methodology is

not to be used to determine this type dispute, the Episcopal Leaders' pleadings and motion will not support summary judgment.

The same result is mandated as to Good Shepherd's personal property for the reasons expressed as to the real property.

The judgment of the court of appeals must be reversed and the case remanded to the trial court.[7]

## B. Remand

The parties advance arguments that may be presented to the trial court upon remand. To assist the trial court in the event they are, we address some of them. *See MCI Sales & Serv. v. Hinton*, 329 S.W.3d 475, 495 n.19 (Tex. 2010) (addressing an issue that would "feature prominently on retrial" in order to "provide guidance to the trial court" even though the issue was not necessary to the ultimate resolution of the case); *Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997) ("Although resolution of this issue is not essential to our disposition of this case, we address it to provide the trial court with guidance in the retrial . . . .").

---

[7] Several amici supporting the deference approach contend that if the neutral principles of law approach is adopted, fairness precludes its retroactive application and that retroactive application of that approach will violate the First Amendment's Free-Exercise clause. These amici cite a footnote in *Jones* wherein the Supreme Court noted that "a claim that retroactive application of a neutral-principles approach infringes free-exercise rights" was not involved in that case since the Georgia Supreme Court "clearly enunciated its intent to follow the neutral-principles analysis" in two prior cases. *Jones*, 443 U.S. at 606 n.4. The parties do not raise the issue except for the Anglican Leaders including it in their reply brief and asking that it be considered if we decide the case on the Episcopal Leaders' proposed legal theory that churches are public charitable trusts or that under the "identity" approach, those who remain part of the hierarchical church of which the congregation was a part before the dispute arose are entitled to possess and control the property. Based on our disposition of the appeal, we need not and do not address it. However, we note that our analysis in *Brown* substantively reflected the neutral principles methodology.

## 1. Control of the Corporation

We first address the Episcopal Leaders' argument that Good Shepherd's corporate powers were restricted by its affiliation with TEC. The Episcopal Leaders assert that TEC's structure, constitution, canons, and rules required parish corporations to remain part of and subject to TEC's authority. They point to the Good Shepherd corporate bylaws confirming that Good Shepherd "is a constituent part of the Diocese of Northwest Texas and of the Protestant Episcopal Church . . . [and Good Shepherd] accedes to, recognizes, and adopts the General Constitution and Canons of that Church." But the vote at the called meeting was in favor of amending the bylaws to delete or change provisions referring to and adopting the canons and constitutions of TEC and the Diocese, and revoking any trusts in the corporate property in favor of them.[8] Absent specific, lawful provisions in a corporation's articles of incorporation or bylaws otherwise, whether and how a corporation's directors or those entitled to control its affairs can change its articles of incorporation and bylaws are secular, not ecclesiastical, matters.

The Episcopal Leaders cite Texas Business Organizations Code § 3.009 and argue that Good Shepherd's articles of incorporation were required to expressly state that the corporation is a member-managed corporation in order for the corporation to be governed by its local members. This argument is unpersuasive to the extent it relates to whether an outside entity has authority to control the corporation. First, even if the corporation were not member managed, that would not mean that its

---

[8] The Episcopal Leaders argued in their reply to the Anglican Leaders' response to the motion for summary judgment that the votes on the resolutions to amend the corporation's bylaws and articles of incorporation failed because the resolutions passed by only a majority and not a two-thirds vote. Because neither party addresses the argument in this Court and the court of appeals did not address it, we do not.

management could be appointed by or was under the control of TEC, the Diocese, or Bishop Ohl, absent corporate documents and law so providing. Second, when Good Shepherd incorporated in 1974 the Non-Profit Corporations Act provided that "[t]he power to alter, amend, or repeal the by-laws or to adopt new by-laws shall be vested in the members, if any, but such power may be delegated by the members to the board of directors." *See* TEX. REV. CIV. STAT. art. 1396-2.09. The current statutory scheme changes the default rule on who is authorized to amend the bylaws, but under neither the former nor the current statute is an external entity empowered to amend them absent specific, lawful provision in the corporate documents. *See* TEX. BUS. ORGS. CODE § 3.009; TEX. REV. CIV. STAT. art. 1396-2.09 (current version at TEX. BUS. ORGS. CODE § 22.102) ("The power to alter, amend, or repeal the by-laws or to adopt new by-laws shall be vested in the members . . . .").

## 2. Control of the Property

It is undisputed that title to the real property is in the name of the corporation. It is further undisputed that the language of the deeds does not provide for an express trust in favor of TEC or the Diocese. Three reasons are suggested for the proposition that TEC should have possession of the property. The first is that under deference principles Bishop Ohl's decision identifying the loyal faction as the continuing Parish of Good Shepherd settled the question of who was entitled to the property and the corporation had no rights in the property other than holding title as trustee for the loyal faction, the Diocese, and TEC. The second is that under neutral principles of law the initial adoption of the constitutions and canons of TEC and the Diocese by the corporation in its bylaws was irrevocable, so any action to revoke that part of the bylaws was void. The third is that because the corporation accepted donations of property and money based on its having subscribed and acceded

26

to the Constitutions and canons of the Diocese and TEC, it cannot obtain the right to own and possess the property by unilaterally changing its articles of incorporation and bylaws.

In regard to the first question, we have held that Texas courts cannot simply use the deference or identity methodology principles to resolve this type of issue. Under neutral principles of law, the deeds conveying the property to Good Shepherd corporation "expressed no trust nor limitation upon the title," and therefore the corporation owns the property. *See Brown*, 116 S.W. at 364. Bishop Ohl could, as an ecclesiastical matter, determine which faction of believers was recognized by and was the "true" church loyal to the Diocese and TEC. Courts must defer to such ecclesiastical decisions. But under neutral principles, any decisions he made about the secular legal questions of whether the vote by the parish members to amend the bylaws and articles of incorporation was valid under Texas law and whether the bylaws and articles of incorporation were validly amended, are not entitled to deference. Nor does his decision identifying the loyal faction as the continuing Episcopal Parish operating Good Shepherd church determine the property ownership issue under this record, as it might under the deference or identity methodology.

As to the second and third reasons, the Episcopal Leaders and several *amici* argue that Good Shepherd's articles of incorporation and bylaws evidence the fact that the corporation is subordinate to TEC and the Diocese. They do not argue, however, that the articles of incorporation, bylaws, or statutory law precluded amendments revoking any relationship with TEC and the Diocese. A religious organization may choose to organize as a domestic non-profit organization and acquire, own, hold, mortgage, and dispose of or invest its funds in property for the use and benefit of and in trust for a higher or other organization. *See, e.g.*, TEX. BUS. ORGS. CODE § 2.102. But whether a religious

27

organization *can* acquire and hold property in trust for another person or entity is a different question from whether it *has done* so, and is also a different question from whether such a choice is irrevocable.

The Episcopal Leaders argue that the Supreme Court's pronouncement in *Jones* that a superior heirarchical church organization's amendment to its constitution to include a trust provision is sufficient to establish a trust in property held by its subordinate churches. The gravamen of this argument is that in *Jones* the Supreme Court established substantive property and trust law to be applied in church property disputes, and under such law a subordinate organization cannot revoke a trust on its property once the superior body imposes it. In support of their argument the Episcopal Church leaders point to the following passage in *Jones*:

> At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. *Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Jones*, 443 U.S. at 606 (emphasis added) (footnote omitted). The Episcopal Leaders argue that TEC adopted canon I.7.4 in 1979[9] in accordance with the *Jones* decision and thereby established a trust as to the property. Canon I.7.4 provides:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission, or Congregation is located. The existence of this trust, however,

---

[9] The Diocese incorporated this provision into its canons in 1982.

shall in no way limit the power and authority of the Parish, Mission, or Congregation otherwise existing over such property so long as the particular Parish, Mission, or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.

The Episcopal Leaders cite other state courts for the proposition that an express trust canon like canon I.7.4 precludes the disassociating majority of a local congregation from retaining local parish property after voting to disaffiliate from the Church. *See The Episcopal Church in the Diocese of Conn. v. Gauss*, 28 A.3d 302 (Conn. 2011); *Episcopal Church Cases*, 198 P.3d 66 (Cal. 2009); *Episcopal Diocese of Rochester v. Harnish*, 899 N.E.2d 920 (N.Y. 2008); *In re Church of St. James the Less*, 888 A.2d 795 (Penn. 2005); *Bishop & Diocese of Colo. v. Mote*, 716 P.2d 85 (Colo. 1986) (en banc).

The Missouri Court of Appeals recently addressed this issue in *Heartland Presbytery v. Gashland Presbyterian Church*, 364 S.W.3d 575 (Mo. Ct. App. 2012). There the court explained that:

> The intent of the . . . passage [in *Jones*] was to explain that, contrary to the dissent's characterization, a "neutral-principles" approach would not impose a particular property-rights regime on the parties, or infringe upon the rights of a denomination's adherents to order their affairs as they saw fit. Instead, like the discussion earlier in the Court's opinion, the quoted passage simply makes clear that, like "private-law systems in general," the application of neutral principles of state property and trust law would afford "flexibility in ordering private rights and obligations to reflect the intentions of the parties." [*Jones*, 443 U.S.] at 604, 99 S.Ct. 3020 (emphasis added). The recitation of the particular documents which might be employed to accomplish the parties' intentions can only be read as illustrative. We will not read the quoted passage as itself establishing the substantive property and trust law to be applied to church-property disputes, particularly where the very same passage contemplates (in its reference to "other neutral principles of state law") that the applicable law—like American property and trust law in general—would be state, rather than federal, law. Further, the statement that "the civil courts will be bound to give effect to" the parties' expressed intentions was explicitly conditioned on those intentions being "embodied in some legally cognizable form"—precisely the issue we address in this opinion.

29

*Id.* at 589.

Our view coincides with that of the Missouri court. We do not read *Jones* as purporting to establish substantive property and trust law that state courts must apply to church property disputes. *See Am. Elec. Power Co. v. Conn.*, ___ U.S. ___, ___,131 S. Ct. 2527, 2535 (2011) ("*Erie* 'le[ft] to the states what ought to be left to them,' and thus required 'federal courts [to] follow state decisions on matters of substantive law appropriately cognizable by the states.'" (citations omitted)); *Jones*, 443 U.S. at 609 ("This Court, of course, does not declare what the law of Georgia is."). The Episcopal Leaders do not cite Texas law to support their argument that under the record before us Good Shepherd corporation was precluded from revoking any trusts actually or allegedly placed on its property.

### IV. Response to the Dissent

The dissent agrees that neutral principles is the proper methodology to apply in this type of case, but argues that summary judgment was properly granted for the Episcopal Leaders because (1) whether Good Shepherd can amend its articles of incorporation and bylaws to delete references to TEC and the Diocese and to revoke any trusts on the property, is at bottom an ecclesiastical matter that courts do not have jurisdiction to address; (2) Good Shepherd's bylaws agreeing to be bound by the Canons of TEC and the Diocese imposed a trust on the property that became irrevocable when Good Shepherd withdrew from TEC; and (3) Good Shepherd is estopped from revoking the trust in favor of TEC and the Diocese. The arguments do not persuade us.

As we have previously noted, the Episcopal Leaders' pleadings do not support summary judgment on the basis of neutral principles because they allege only that they are entitled to the

property based on application of the deference methodology. Further, their only ground for summary judgment was that deference principles apply and the property goes to those members of the congregation recognized by Bishop Ohl as the true membership of Good Shepherd. But the deference methodology is inapplicable under our holding in this case. Moreover, going beyond the procedural issue, the dissent's arguments are not supported by the record.

The dissent's first argument, that Good Shepherd corporation could not amend its articles of incorporation and bylaws to omit references to TEC and the Diocese because doing so would circumvent "an ecclesiastical decision made by a higher authority within a hierarchical church structure," is in substance application of the deference methodology. That position, if applied in this case, would subject the corporation's decision makers and the parish members who were qualified to vote under the bylaws to the dictates of persons not identified in corporate governing documents as having the right to make, control, or override corporate decisions. Despite agreeing that the neutral principles methodology applies, the dissent's argument ignores the fact that Good Shepherd was incorporated pursuant to secular Texas corporation law and Texas law dictates how the corporation can be operated, including how and when corporate articles and bylaws can be amended and the effect of the amendments. The dissent points to neither a requirement in the corporate documents that amendments are subject to approval by the Diocese or TEC, nor to any Texas law precluding the corporation from amending its articles and bylaws to exclude references to the Diocese and TEC. To the contrary, the articles of incorporation and bylaws specified that qualified parish members were entitled to elect the vestry and amend the bylaws.

31

Second, the dissent concludes that despite there being no trust language in either the deeds transferring property to Good Shepherd or in Good Shepherd's articles of incorporation or bylaws, the Dennis Canon, which provides in part that "all real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for TEC," and Good Shepherd's actions before the split conclusively establish Good Shepherd's intent to hold its property in trust for the benefit of TEC and the Diocese. The dissent then concludes that the trust is irrevocable because the Dennis Canon limits Good Shepherd's authority over its property to the period of time for which it remains a part of and subject to TEC. But the Episcopal Leaders did not move for summary judgment on this basis. *See* Tex. R. Civ. P. 166a(c); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) ("Summary judgments, however, may only be granted upon grounds expressly asserted in the summary judgment motion."). Further, even assuming a trust was created by the Dennis Canon and Good Shepherd's bylaws and actions, we disagree that the Canon's terms make the trust expressly irrevocable as Texas law requires. The dissent interprets the Dennis Canon as limiting Good Shepherd's authority over the property to the time Good Shepherd remained affiliated with TEC and the Diocese. Assuming the Dennis Canon imposed a trust on Good Shepherd's property and limited Good Shepherd's authority over the property as the dissent argues, and we expressly do not decide whether it did, the Canon simply does not contain language making the trust *expressly* irrevocable. *See* Tex. Prop. Code § 112.051 ("A settlor may revoke the trust unless it is irrevocable by the express terms of the instrument creating it or of an instrument modifying it."). Even if the Canon could be read to *imply* the trust was irrevocable, that is not good enough under Texas law. The Texas statute requires *express* terms making it irrevocable. *See Vela v. GRC Land Holdings, Ltd.*, 383

S.W.3d 248, 252-53 (Tex. App.—San Antonio 2012, no pet.) ("Because section 112.051(a) requires express language of irrevocability, we conclude that the use of the term 'forever' in the special warranty deed did not cause the Trust to become irrevocable.").

Under its third argument, the dissent would hold that the doctrine of estoppel applies and requires that the judgment of the court of appeals be affirmed. But summary judgment may only be granted based on grounds pleaded and expressly presented in a motion for summary judgment. TEX. R. CIV. P. 166a(c); *G & H Towing Co.*, 347 S.W.3d at 297. The Episcopal Leaders neither pleaded estoppel nor urged it as a ground for summary judgment.

## V.  Conclusion

The judgment of the court of appeals is reversed. The case is remanded to the trial court for further  proceedings consistent with this opinion.

_____
Phil Johnson
Justice

**OPINION DELIVERED:**  August 30, 2013