# Supreme Court of Texas

No. 23-0703

Southern Methodist University and Paul J. Ward,

*Petitioners,*

v.

South Central Jurisdictional Conference of the United Methodist Church and Bishop Scott Jones,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

JUSTICE YOUNG, joined by Justice Devine and Justice Sullivan in full, and by Chief Justice Blacklock as to Parts I, III, and IV, concurring.

The Court gets today's case right. SMU's articles of incorporation clearly state that SMU is "to be forever owned, maintained and controlled by the South Central Jurisdictional Conference of The United Methodist Church," whose predecessor created SMU as part of its religious mission. Among the forms of "control[]" that the articles expressly reserve to the Conference is that "[n]o amendment to these Articles of Incorporation shall ever be made" unless the Conference "affirmatively authorize[s] and approve[s]" the amendment.

But in 2019, SMU attempted to amend those articles of

incorporation without the Conference's consent. They were not just any old amendments, either. Instead, they purported to eliminate all the Conference's authority and indeed all reference to the Conference. SMU sought to do to the Conference what Pharaoh (according to Cecil B. DeMille, at least) sought to do to Moses: "Let the name of Moses be stricken from every book and tablet, stricken from all pylons and obelisks, stricken from every monument of Egypt." *The Ten Commandments* (Paramount Pictures 1956).

The Court holds today that Texas law allows the Conference—and any religious organization that creates a corporation to achieve its mission—to protect its rights and petition a Texas court to determine whether the corporation's articles of incorporation were lawfully amended. And if they were not, the result will be to restore a religious organization's authority and autonomy.

Multiple paths lead to today's judgment. The clearest and most basic, as the Court describes, is found in § 22.207 of the Business Organizations Code. That statute's text focuses exclusively on religious organizations' authority to control nonprofit corporations—the exact circumstance of this case. The statute does very little, if anything, if it does not manifest authority for religious organizations to defend that control even in the face of more generic statutory rules, such as the general limitation on lawsuits in § 20.002 of the Business Organizations Code.

Beyond its correctness as a matter of pure statutory interpretation, the Court's approach prevents us from having to formally address a different path to the same outcome: the church-autonomy doctrine. It is always preferable to resolve a case on nonconstitutional grounds when

2

possible. But that constitutional doctrine still looms over the dispute, in part because § 22.207 codifies some of its principles. I therefore gladly join the Court's opinion but write separately for three distinct reasons.

First, as the Court observes, its reading of § 22.207 would flow from the doctrine of constitutional avoidance even if there were doubt about whether § 22.207 authorizes declaratory-judgment actions. *Ante* at 18. In fact, even absent § 22.207, this Court may have read § 20.002 in favor of religious autonomy; with § 22.207, we face no such difficult choice. Through that provision, the legislature has lifted a regulation that would otherwise burden religious self-governance.

Second, the church-autonomy doctrine, which underlies § 22.207, is a constitutional principle of literally transcendent importance. Reaching any result other than the one the Court reaches today would pose grave concerns under the doctrine because it would threaten religious organizations' authority to govern themselves. This Court has had only a handful of opportunities to address the church-autonomy doctrine (which, of course, protects religious entities of any faith despite the "church" shorthand). Significant questions about its scope and application remain, as illustrated by the dueling briefs of the two amici curiae in this case, First Liberty Institute and the Becket Fund for Religious Liberty. Their briefs share many foundational premises and express a common goal, yet they reach diametrically opposed outcomes. I hope that these amici and others will continue examining the church-autonomy doctrine so that in future cases, the risk of error on the Court's part will be reduced.

Third, and relatedly, I write to call attention to the need to examine

the *Texas* church-autonomy doctrine.  Our cases thus far have turned only on *federal* constitutional law.  Federal principles, of course, are binding— but they are not necessarily *limiting*.  The Texas Constitution's text is markedly different in ways that, I suspect, may materially affect how Texas courts analyzing church-autonomy disputes will react.  Our Constitution strikes me as even more protective of the autonomy of religious organizations.  Texans have never purported to "grant" religious freedom to anyone; they instead have always acknowledged it as an inalienable right that government should protect.  The Texas Constitution's church-autonomy doctrine reflects our People's deep humility in affirmatively disclaiming any power, much less any intention, to interfere in the relationship between God and man.  Mapping our Constitution's distinct contours based on its original public meaning will, again, require assistance from amici, the bar, the public, litigating parties, and our colleagues on the lower courts.

**I**

Business Organizations Code § 22.207 makes this an easy case.  It does not just permit a board to be "elected" by a religious organization but to be "controlled" by one.  Without that statute, the Conference would have to overcome Business Organizations Code § 20.002, which SMU compellingly argues forecloses the Conference's ability to challenge the validity of the amendments to SMU's articles of incorporation.  SMU likewise persuasively argues that articles of incorporation generally cannot be the foundation for a breach-of-contract claim.

As the Court today observes, the doctrine of constitutional avoidance demands that we harmonize § 22.207 and § 20.002, thereby

4

safeguarding constitutional protections enjoyed by religious organizations. It is possible, in fact, that § 20.002 would not apply to entities like the Conference *even if § 22.207 did not exist*. The U.S. Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), shows why that might be so.

In *Catholic Bishop*, the Court confronted the NLRB's assertion of authority to subject parochial schools to its jurisdiction under the National Labor Relations Act. *Id.* at 504. If the Act in fact authorized such jurisdiction, the Court would need "to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Id.* at 507. The Court was able to avoid those constitutional questions by observing that "[t]here is no clear expression of an affirmative intention of Congress that teachers in church-operated schools should be covered by the Act," *id.* at 504, and then refusing to interpret the Act as conferring jurisdiction over schools operated by churches "in the absence of a clear expression of Congress' intent to" do so, *id.* at 507. In other words, even though the Act did not expressly *exclude* parochial schools, the Court refused to read it as *including* them unless Congress made that intent clear.

Similarly, and especially in a State that likely privileges religious self-governance more than the minimum required by the federal Constitution, I would expect greater clarity from the legislature before concluding that it had imposed the limitations of § 20.002 on religious organizations like the Conference. Of course, the Court today does not decide whether § 20.002 is insufficient on its own to foreclose a religious organization's recourse to court to vindicate its control over a nonprofit

5

corporation, and I do not purport to do so either. But under the *Catholic Bishop* approach, it is far from implausible that this Court would interpret § 20.002 in favor of religious autonomy.

Fortunately, our legislature *has* provided the further guidance that was lacking in *Catholic Bishop*, which is where § 22.207 enters the scene. Rather than supplying the "clear expression of an affirmative intention" to subject religious organizations to § 20.002, what we find is § 22.207, which pushes in exactly the opposite way. Far from confirming that religious organizations may lose their control when § 20.002 would apply, it resoundingly reaffirms their control, and "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987).

As the Court observes, *see ante* at 20–21, our State's Constitution—unlike the federal Constitution—has imposed a duty upon the legislature to pass laws to ensure that religious entities are not stymied in carrying out their "mode" of worship. Tex. Const. art. I, § 6. Section 22.207 is one such law. It offers extra protection for religious organizations, and only for them. By dispensing with the general requirements of § 20.002 in the context of religious self-governance, § 22.207 "lift[s] a regulation" that otherwise "burdens the [Conference's] exercise of religion." *Amos*, 483 U.S. at 338. In so doing, it prevents § 20.002 from becoming a tool that would diminish religious organizations' ability to control corporations that help them "carry out their religious missions." *Id.* at 335, 339.

I thus agree with the Court that at the very least, § 22.207 must be read as preserving religious organizations' authority to seek recourse

6

to the courts even when § 20.002 might drain that authority in other contexts.  In that way, § 22.207 is in part a manifestation of the church-autonomy doctrine as enacted by the legislature.

**II**

Relevant to the Court's invocation of constitutional avoidance is the insistence from amici to apply the church-autonomy doctrine.  That doctrine is implicated here given the Conference's efforts to preserve its religious self-governance under Texas corporate-formation law.  As Justice Thomas recently observed, religious organizations "do not exist apart from the secular world." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, ___ U.S. ___, ___, No. 24-154, 2025 WL 1583299, at \*11 (U.S. June 5, 2025) (Thomas, J., concurring).  Even if they are not *of* the world, they are still *in* it, and they must regularly engage in mundane tasks like buying and selling property, hiring and paying staff, forming contracts, and (alas) filing lawsuits. *See id.*  "These and other considerations make the formation of corporate entities essential for many religious institutions." *Id.*  And when they form corporations, "the First Amendment . . . gives special solicitude to the rights of religious organizations," not lesser solicitude. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012).

Section 22.207 is a law that affords such "special solicitude," but beyond that provision, the courts must protect religious autonomy by upholding the lawful secular choices that religious organizations make.  Doing so is not always as easy as it sounds (or as easy as it is in today's case).  There are impermissible lines that courts may not cross.  Courts may not consider, much less rule upon, disputed doctrinal questions.  Nor

7

may courts intervene in a church's mode of self-governance or second-guess the resulting decisions. A court doing so may well intend to defend religious autonomy, but such a court would both exceed its authority and undermine the very principles it hoped to advance.

I turn first to the principles of the church-autonomy doctrine. I only briefly sketch its central features, many of which are so well covered in precedent and in scholarship as to warrant very little discussion here. But other corners of the doctrine are somewhat less commonly recognized, including why the church-autonomy doctrine can command the entire government, including courts, whether affected parties invoke it or not. I discuss those nuances at somewhat greater length. Second, I examine how those principles apply here and conclude that but for our ability to rely on § 22.207, and assuming we could not read § 20.002 as I hypothesized above, the Court—and not just a concurring opinion—would have to confront serious constitutional issues yet would reach the same result.

One final prefatory note: the tentative nature of what follows. It is hard to imagine a corner of the law that is more important (or more challenging) for the courts to get right. My goal is to identify several central issues that warrant further analysis, describe corresponding principles that seem grounded in our constitutions' religious-liberty provisions, and invite future parties, amici, and others to take aim at my conclusions. Further research and analysis may confirm my provisional views; perhaps those views will be dislodged in whole or part, and if so, nothing said today will commit me in a case tomorrow to any particular position. Either way, any resulting assistance will benefit us by making it more likely that when the Court must bind itself to some understanding—

when, unlike in this case, we face a concrete yet unavoidable constitutional conflict—the understanding we adopt will be sound.

## A

The church-autonomy doctrine represents a commitment inherent in the federal and Texas Constitutions' protections of religious liberty to affirm the inalienable right of religious organizations, and their individual adherents, to their own beliefs and forms of self-governance. It is a *substantive* commitment that raises *jurisdictional* obstacles by delineating a zone of belief and practice into which the government may not enter. Those obstacles apply to the entire government—not only in litigation. When the church-autonomy doctrine does arise in that context, how a court should respond depends on the nature of the issues raised, not merely on whether religious organizations are involved. Sometimes a court must decline to exercise jurisdiction over part or all of a case; sometimes the exact opposite is true. In every instance, what matters is which action is consistent with the overriding principle of church autonomy.

## 1

"[T]he jurisdictional line prohibiting civil courts from intruding on ecclesiastical matters is an ancient one" that became "so entrenched in English history that even [Sir Edward] Coke—the seventeenth century's fiercest champion of civil jurisdiction and the common law—respected it." *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066, 1077 (5th Cir. 2020) (Oldham, J., dissenting from denial of rehearing en banc). Governments and courts in America have not always plotted this line with perfect clarity or fidelity, to put it mildly. But the basic contours of the autonomy principle have always been present in this

9

country, including before the Constitution itself was ratified.

In a striking and early example of the doctrine's extrajudicial force, a group of French Catholics in 1781 requested that Congress, then operating under the Articles of Confederation, approve their appointment of a bishop in America amid a political crisis with the French magisterium. Carl H. Esbeck, *Church Autonomy, Textualism, and Originalism: SCOTUS's Use of History to Give Definition to Church Autonomy Doctrine*, 108 Marq. L. Rev. (forthcoming June 2025) (manuscript at 144), https://ssrn.com/abstract=5099688. In response, Benjamin Franklin was instructed to notify the French minister that "the subject of his application . . . being purely spiritual, it is without the jurisdiction and powers of Congress." *Id.*

Back in the judicial branch, the U.S. Supreme Court has outlined the First Amendment's protection of church autonomy in about a dozen significant cases. Justice Alito recently summarized the substance and scope of the Court's church-autonomy precedents:

> As early as 1872, our church-autonomy cases explained that "civil courts exercise no jurisdiction" over matters involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 13 Wall. 679, 733 (1872). That is so because the Constitution protects religious organizations "from secular control or manipulation." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952). The religious organizations protected include churches, religious schools, and religious organizations engaged in charitable practices, like operating homeless shelters, hospitals, soup kitchens, and religious legal-aid clinics . . . among many others.

*Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022)

(statement of Alito, J., respecting the denial of certiorari).

This Court, relying on the same line of cases, has similarly emphasized that "[u]nder the First Amendment, . . . courts must abstain from exercising civil jurisdiction over claims that require them to 'resolve a religious question' or 'impede the church's authority to manage its own affairs.'" *In re Diocese of Lubbock*, 624 S.W.3d 506, 509 (Tex. 2021) (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007)). The case law reflects two basic boundary lines separating religious authorities from the civil government: questions of religious doctrine and matters of religious self-governance.

At its core, the church-autonomy doctrine is merely a formal restatement of basic truths that the Constitution adopts. Specifically, every individual has a preexisting and inalienable right to worship according to his own conscience. That right encompasses associating with others of like mind and includes each individual's ability to join religious institutions. The autonomy of a religious organization within the religious sphere is a necessary consequence and manifestation of *individual* religious liberty. Whether for a massive, international church or a tiny cluster of believers, application of the church-autonomy doctrine respects that "different and higher plane" upon which ecclesiastical relationships stand. *Minton v. Leavell*, 297 S.W. 615, 622 (Tex. Civ. App.—Galveston 1927, writ ref'd).

The government can avoid instructing citizens on matters of faith or purporting to measure a church's compliance with its own dogma without being blind to the existence of religious practice. The federal and Texas Constitutions require the government to protect religious liberty at least

11

as thoroughly as other kinds. Thus, with respect to religious organizations' self-governance, the government's only (yet quite significant) role is to vindicate an ecclesiastical community's right to organizational and doctrinal independence. When a religious organization chooses the corporate form for one part of its mission—a parish church, an entity committed to community outreach, or a university—the government, including the courts, must respect and uphold that choice.

**2**

It can be tempting to think of the church-autonomy doctrine as mostly about judicial "subject-matter jurisdiction." It obviously extends to the judicial power, *see infra* Part II.A.3, but it unduly constrains the doctrine to view it as applying in court while forgetting about the rest of the government.

Accordingly, I pause to emphasize that this Court has been clear in stating that *any* "[g]overnment action that interferes with [religious] autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is . . . prohibited by the First Amendment." *Diocese of Lubbock*, 624 S.W.3d at 513. The church-autonomy doctrine "protect[s] the right of churches and other religious institutions to decide matters of faith and doctrine without *government intrusion.*" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (emphasis added) (internal quotation marks omitted). That means that *any* "[s]*tate interference* in that sphere would obviously violate the free exercise of religion, and *any attempt* by *government* to dictate or even to influence such matters would constitute" an unconstitutional "intrusion." *Id.* (emphases added).

12

This broad prohibition against the "government" *in toto*, *see Diocese of Lubbock*, 624 S.W.3d at 512–13, is "a structural restraint," *see Westbrook*, 231 S.W.3d at 397, that commands each branch of government to consistently measure its own conduct against the substantive principle that religious organizations must govern themselves. That principle does not merely confer rights, as important as they are; it also provides an absolute boundary dividing civil governmental power from a wholly different realm of sovereignty.

And while religious organizations (and individual believers) obviously benefit from the government's refusal to meddle in matters of religious doctrinal truth or self-governance, the civil government also benefits. Steering clear of this forbidden area—resisting temptations and even invitations to instruct any religious community about the contents of its faith or the propriety of its internal governance—helps the government preserve its own integrity. In short, limitations from the church-autonomy doctrine, like other fundamental restrictions on judicial power, do not belong solely to the litigants in a case to invoke or not as they deem fit. The doctrine is the common inheritance of every citizen, and because it represents an exclusion of civil authority and not just the recognition of private rights, it becomes the common duty of *any* state actor to respect the doctrine's core limits however (or whether) it is invoked.

**3**

With that foundation, I now turn to the narrower question of what the church-autonomy doctrine requires specifically of the judicial department. Church-autonomy litigation often involves the government, but it also arises within purely private disputes about the contested

13

ownership of property dedicated to religious use or, as in this case, about corporate governance. Of course, a court's initial obligation in any case is to assess its own jurisdiction, and the church-autonomy doctrine can specifically require courts to disclaim jurisdiction over part or all of a lawsuit, even where the parties have not raised or may have arguably forfeited the issue. By the same token, however, the church-autonomy doctrine can require courts to *exercise* jurisdiction. I therefore proceed by addressing the church-autonomy doctrine and (1) its relationship to the doctrines of waiver and forfeiture, (2) its effects on courts' jurisdiction, and (3) its applicability to both public and private litigation.

*First*, it is notable at the outset how the church-autonomy doctrine first arose in this case. It was not the parties, but the court of appeals, that identified the risks of treading on prohibited grounds. The question thus arises: When parties fail to timely invoke the church-autonomy doctrine, or perhaps when they affirmatively *want* the courts to adjudicate religious disputes, do the usual waiver and forfeiture tests apply? In other words, may courts disregard the church-autonomy doctrine when the parties themselves fail to raise it or ask the courts to look past it?

The court of appeals acted responsibly by addressing the matter itself. Indeed, when a question is not merely one that implicates religious rights but is altogether outside a court's constitutional authority to answer, such a limitation cannot be subject to ordinary invocations of waiver or forfeiture. The ability to waive or forfeit an objection traditionally belongs to the parties themselves, but as I have discussed, the church-autonomy doctrine belongs to the People and applies as a structural limitation on the government. When a religious organization fails to object to a court's

14

taking a constitutionally unauthorized step—or even if the organization expressly invites it—the court remains duty-bound not to take actions or decide questions forbidden by the church-autonomy doctrine.

That duty is no less relevant than if the parties are willing for the court to render judgment in a collusive suit, or to opine on a case that is now moot or in which the plaintiff never had standing, or to render an advisory opinion on a matter of great interest to the public, or to answer a political question that is not susceptible to principled judicial decision-making. In none of those circumstances do notions of waiver and forfeiture matter. *Cf. Tex. Disposal Sys. Landfill, Inc. v. Travis Cent. Appraisal Dist.*, 694 S.W.3d 752, 760 (Tex. 2024) ("[P]arties cannot confer jurisdiction by agreement."). Parties and counsel must identify plausible jurisdictional objections as soon as they are aware of them. *See, e.g., Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 356 (Tex. 2024). But whether they comply with this obligation or not, what matters in each situation is that the courts protect their own integrity as institutions exercising only judicial power. The same is true here. Courts lack *authority* to opine on the true meaning of religious doctrine or to inject themselves into a religious organization's self-governance regardless of the parties' litigation conduct.

*Second*, it may be tempting to develop a jurisdictional "rule" that, like a drop of arsenic in a glass, is fatal to justiciability whenever a dispute is of religious significance to the parties. That circumstance should alert judges to the potential for serious constitutional limitations, but if religiosity automatically defeated subject-matter jurisdiction, religious organizations would have *fewer* rights than everyone else.

The correct test derives from the doctrine's substantive principles:

15

If a court cannot resolve an otherwise-proper claim without second-guessing religious organizations' modes of self-governance or purporting to settle disputed questions of faith or doctrine, the court lacks jurisdiction to act or answer. "'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings' . . . ." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)). Jurisdiction here bears its truest and rawest meaning: *power*. Courts are not "divested" of jurisdiction in some formalistic sense—they simply lack any power in the first place to opine as to religious truth or to meddle in the inner-workings of religious entities.

The U.S. Supreme Court confronted a clear invitation to transgress this boundary in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969). A local church sought to emancipate itself from the larger denomination, and under Georgia law, "the right to [its real] property" depended on a "jury decision as to whether the [larger] church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it." *Id.* at 441. The Supreme Court made clear that awarding rights to property based on how a civil court assesses the meaning and importance of religious doctrine is always impermissible. *Id.* at 449. Instead, "civil courts [must] decide church property disputes without resolving underlying controversies over religious doctrine." *Id.*

Because of that limitation, a case that raises only purely religious issues must be dismissed. Courts lack the *power* to resolve such issues. But cases that seem to invite such religious assessment, at least at first blush, may yet be justiciable. In *Presbyterian Church*, for example, the

16

dispute was religiously motivated but could be (and on remand to the Georgia Supreme Court *was*) disposed of without resolving ecclesiastical questions. *See id.*; *see also Presbyterian Church in U.S. v. E. Heights Presbyterian Church*, 167 S.E.2d 658, 659–60 (Ga. 1969). Other examples arise where courts exercise authority strictly to protect church autonomy without ever addressing any religious issue. The issue in any case is *how* to avoid red lines. Above all, the court may do nothing more than use secular tools to recognize (and not actually itself make) decisions that the religious entity alone can reach. *See Presbyterian Church*, 393 U.S. at 449 (noting the "severely circumscribe[d] role" of the courts).

This area is not the only one that presents significant difficulty for courts, of course. The separation-of-powers context provides a useful analogue. Some questions are beyond the courts' capacity or authority to address at all—particularly those that are expressly left to another branch of government. But resolving separation-of-powers disputes is a core judicial function—the courts do not *themselves* answer the underlying issue, but they can identify the correct entity to do so and enforce whatever decision that entity makes. *See, e.g.*, *Zivotofsky v. Clinton*, 566 U.S. 189, 196–97, 201 (2012) (noting that the courts could not "decide the political status of Jerusalem" but that they could decide which political actor could make that choice); *In re Tex. House of Representatives*, 702 S.W.3d 330, 334 (Tex. 2024) (recognizing the Court's inability to resolve the underlying criminal-law dispute but addressing "the important but unresolved separation-of-powers question presented" that asked "how the People of Texas have structured their government and to which governmental entities they have allocated specific kinds of authority").

Just as courts may vindicate the authority of a properly authorized branch of government to make decisions that the courts themselves may not make, courts may vindicate property rights or the like even in cases with obvious "religious implications." Using civil tools to determine *who* is authorized to make a decision that is binding in a civil court is—and must be—wholly distinct from the court itself making such a choice, which can be motivated by religious considerations. Assessing the *religious* propriety of the choice goes beyond the courts' authority, just as resolving separation-of-powers disputes does not depend on the *political* propriety of a choice belonging to another branch of government.

None of this is to say that it will always be *easy* for courts to use secular tools to resolve disputes involving religious entities. The exercise is fraught with peril, and courts must constantly guard against inadvertent slippage into unauthorized terrain—to mistakenly slide from vindicating church autonomy into supplanting it.

Compounding this difficulty is the important point that jurisdictional limitations are granular; they are not necessarily case-level decisions. The solution in *Presbyterian Church* was not dismissal—it was for the Georgia courts to apply a standard that did not require them "to resolve ecclesiastical questions." 393 U.S. at 449.

The jurisdictional question, therefore, is not binary. Perhaps the most famous church-autonomy case of them all is *Watson v. Jones*, which involved another dispute among Presbyterian churches that heatedly debated each other's religious bona fides. 80 U.S. (13 Wall.) 679 (1871). The Supreme Court declared that the theological controversy was "strictly and purely ecclesiastical in its character" and thus beyond the

18

jurisdiction of civil courts to adjudicate. *Id.* at 733. But that did not mean that the Court treated the *case* as failing to clear a genuine jurisdictional bar, which would have required dismissal. Rather, it affirmed the circuit court's decree on the merits, which had in turn deferred to the governing assembly's decision as to who was properly authorized to constitute the Presbyterian church in question. *Id.* at 700, 735. The case was justiciable, even though the underlying religious controversy was not. *Watson* provides enduring guidance to courts resolving property disputes that arise amid religious quagmires.

This Court followed *Watson* when confronted with a similar fact pattern. We did not declare the case nonjusticiable; we explained that *Watson* "shows conclusively that the determination of an ecclesiastical court as to its jurisdiction over a given question is as conclusive upon the civil courts as is its decision of the question when made." *Brown v. Clark*, 116 S.W. 360, 364 (Tex. 1909). We lacked jurisdiction to reopen an ecclesiastical decision on a matter of doctrine, even where that doctrinal decision in turn compelled a particular result for property ownership. *Id.* Rather than requiring dismissal, we were required to reinstate the trial court's judgment, which had awarded the property consistent with the church body's decision, and even to assess costs against the plaintiffs in error. *Id.* at 365; *see also Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 605–06 (Tex. 2013) (observing that *Brown*, properly understood, adopted a "neutral principles" approach to church-property disputes).

The lack of civil jurisdiction over religious questions, therefore, does not necessarily entail a lack of jurisdiction over the *entire* dispute. Courts should maintain their focus on whether, in resolving an otherwise

19

justiciable controversy, they must cross one of the red lines that the Supreme Court's and this Court's cases have identified. If so, they may not take that step; if they can resolve the dispute in a way that does not so trespass, then their jurisdiction is not threatened.

The same principle, however, can generate the contrary outcome—where courts must *exercise* jurisdiction, at least so long as all other jurisdictional prerequisites are met. In such circumstances, failing to exercise jurisdiction would undermine and even violate the doctrine. Consider the U.S. Supreme Court's decision in *Kedroff*, in which rival factions of the Russian Orthodox Church contested who was in control of the cathedral and the church's functions in New York—that is to say, who was the true archbishop. *See* 344 U.S. at 96. The New York legislature passed a law that had the effect of transferring this authority to one faction. *Id.* at 97–99. Unsurprisingly, the Supreme Court held that the statute violated the Constitution. *Id.* at 107, 119. The "controversy concerning the right to use St. Nicholas Cathedral [was] strictly a matter of ecclesiastical government," implicating a power clearly lodged in the mother church and certainly not susceptible to change by governmental fiat. *Id.* at 115. Accordingly, *exercising jurisdiction* was necessary to vindicate the relevant religious community's allocation of authority.

Vindicating church autonomy is sometimes possible, in other words, only when a court *exercises* subject-matter jurisdiction, which can ensure that the substantive constitutional principle is not honored in name while defiled in practice. This can require deeming governmental actions invalid in some cases or restoring the *status quo ante* if private parties seek to drain a religious entity of its control. In no instance may

20

a court become an arbiter of religious doctrine or the proper inner-workings of a religious entity, but dismissing a case asking a court to *protect* the religious entity's authority to make those very choices for itself would jeopardize the "spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* at 115–116 (citing *Watson*, 80 U.S. at 727). Taken to its extreme, a talismanic dismissal of cases for "lack of subject-matter jurisdiction" risks closing the courthouse doors to religious organizations, rendering them helpless to protect their constitutional rights and achieving the exact opposite of the religious-liberty aspirations of our constitutions.

In proper circumstances, therefore, the church-autonomy doctrine may require a court to exercise jurisdiction and rule for the religious entity on the merits—not because of any religious inquiry but because of the church-autonomy doctrine's substantive reach. In *Hosanna-Tabor* and *Morrissey-Berru*, the U.S. Supreme Court again applied the church-autonomy doctrine's substantive principles, concluding in both cases that the religious organizations (specifically, the religious schools) *won* because of the substantive promise that the government *will not second-guess* how a religious organization undertakes the fundamental task of choosing its leaders. *Hosanna-Tabor*, 565 U.S. at 198; *Morrissy-Berru,* 591 U.S. at 762.

Such a win is on the merits. It does not depend on scrutinizing religious choices, beliefs, or self-governance. The merits decisions did not turn on whether the church's reasons for terminating the teachers' jobs

21

were sufficiently grounded in the faith—or whether they turned on religious reasons at all. Instead, *regardless* of the reason, "it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Hosanna-Tabor*, 565 U.S. at 185. The church-autonomy doctrine's breadth, in other words, can allow courts to respect and vindicate the interests of religious organizations on the merits and without crossing any impermissible red line.

Beyond cases in which the courts are facially deprived of jurisdiction (*i.e.*, when they are affirmatively asked to opine as to religious truth) or cases in which the courts must exercise jurisdiction (*i.e.*, when doing so would vindicate a religious organization's autonomy), there may be a third variant. Specifically, dismissal may be inevitable for cases in which it is impossible to impose general secular law against a religious organization without affecting its internal governance, even if the court does not formally address any question of doctrine. Several of our precedents fit in this category, at least from my perspective.

Take the defamation and intentional-infliction-of-emotional-distress claims in *Diocese of Lubbock*. We explained that "[a]lthough tort law imposes a duty not to defame or intentionally inflict emotional distress upon others, a civil suit that is inextricably intertwined with a church's directive to investigate its clergy cannot proceed in the courts." *Diocese of Lubbock*, 624 S.W.3d at 517 (internal citation omitted). The principle, we said, was that "courts are prohibited from risking judicial entanglement with ecclesiastical matters." *Id.* at 514 (citing *Morrissey-Berru*, 591 U.S. at 761). We concluded that "to the extent [the] suit directly challenges the Diocese's application of Canon Law in its internal

governance process, the court lacks jurisdiction." *Id.* at 516. The particular red line was that the suit was "'inextricably intertwined' with the Diocese's decision to investigate its own clergy, judicial review of which would impermissibly interfere with a church's ability to regulate the character and conduct of its leaders," and "exercising jurisdiction would invade the Diocese's internal management decision to investigate its clergy consistent with its own norms and policies." *Id.* at 516–18.

Likewise, in *Westbrook v. Penley*, we considered a legislatively mandated duty of confidentiality for professional counselors as issued in a state regulation. 231 S.W.3d at 402–03. "But however highly we might rate the importance of that interest, it is by no means absolute when impingement on free-exercise rights results." *Id.* In that case, the same defendant was a minister and a licensed counselor, and he revealed to his congregation that the plaintiff had engaged in an affair and was thus to be subjected to church discipline, to which she had agreed. *Id.* at 391. There was no way to hold the defendant to his secular duties without penalizing him for following the ecclesiastical process that the church had mandated. *Id.* at 400.

Just as I described above the risk of courts too quickly dismissing cases that should be adjudicated despite the initial appearance of serious religious disputes, the converse risk also exists. We ultimately "must carefully scrutinize the circumstances so as not to become entangled in a religious dispute." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008). In other words, we look hard to ensure that what *seems* to be secular is not a mere stalking horse—intentional or otherwise—for subjugating a religious organization to civil authority for

23

matters that actually are ecclesiastical.

*Third*, and finally, it is worth reiterating that while the church-autonomy doctrine is one that limits the government, it also plays a significant role in private litigation. What is more, many cases applying the doctrine involve private litigation in which the courts must render judgment rather than dismiss, thus vindicating religious autonomy. The U.S. Supreme Court's decision in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), provides one good example. There, the private lawsuit subjected a church to extensive judicial scrutiny about its compliance with its internal canon law, which resulted in the reinstatement of a particular bishop as the "Diocesan Bishop." *Id.* at 708; *see also id.* at 725 (Rehnquist, J., dissenting) (observing that the litigation was purely private). The Supreme Court rejected this extraordinary intrusion, but it did not demand dismissal for want of jurisdiction—it instead required the state courts to accept the binding determination of the "mother church," which in turn determined the ownership of certain property. *Id.* at 713 (majority opinion).

**B**

The Conference alleges a wrongful divestiture of its control over SMU. Given the church-autonomy doctrine, the outcome that the Court reaches today seems inevitable—if not under § 22.207, then under the constitutional principles described above. I proceed in three brief steps. First, there is sufficient governmental involvement here to implicate the doctrine, although I doubt that any particular state action is even needed. Second, litigating corporate articles and litigating property disputes are materially indistinguishable for these purposes—both are delicate, but

24

both are doable. And third, this case does not come close to crossing any of the red lines that would require dismissal rather than vindication of a religious organization's claim. Allowing the Conference to make its case cannot possibly violate the church-autonomy doctrine, but denying it that chance likely would.

**1**

First, SMU downplays the church-autonomy issue by depicting the case as purely private, simply "requir[ing] resolution of settled, neutral principles of law" to prevent what it depicts as a complete outsider—the Conference—from wresting control of the university. (The Conference likewise regards the case as simple, but it casts the board of trustees rather than itself as the interloper.) Assuming that any particular state action is needed, it is easy enough to find. To the extent the State is involved, it was because SMU's board asked the secretary of state to accept amended articles that, if effective, would emancipate SMU from the Conference.

The days have long passed in Texas when corporate formation required an express act of the legislature. *See, e.g.*, *Paxton v. Annunciation House, Inc.*, ___ S.W.3d ___, 2025 WL 1536224, at *4–5 (Tex. May 30, 2025). It remains true, however, that corporations are legally created and altered "dependent upon the consent of the sovereign power." *A. B. Frank Co. v. Latham*, 193 S.W.2d 671, 673 (Tex. 1946) (citation omitted). *Both* parties agree that the secretary of state's role here, although ministerial, was legally decisive and indispensable. Regardless of whether the board *ought* to have filed the amended articles with the secretary, in other words, everyone agrees that her acceptance of the filing is what makes it legally enforceable. By contrast, merely

25

deleting references to the Conference in some internal memo would have had no force; removing any mention of the Conference from SMU's articles and then filing them *with the State* is what does. Such recourse to state authority supplies sufficient connection to government to implicate the church-autonomy doctrine, despite the involvement being passive and the State's lack of any interest in whether, under properly amended articles, the Conference retains or relinquishes its control.

SMU was apparently left free, if its students and staff disagreed with any doctrine of the larger United Methodist Church, to distance itself from those doctrinal stances. SMU did so in numerous ways even as this litigation was unfolding, assuring students that the university disagreed with the church's (now abandoned) "Traditional Plan," that the university would still provide the inclusive learning environment the plan purportedly threatened, and that the university would continue to comply with federal civil-rights guidance on sexual orientation notwithstanding any (apparently illusory) contrary guidance from the church. Whatever authority the Conference may have had to countermand any of these steps, it seemingly chose restraint. And whatever else SMU might be able to do to signal its own distinct views, it could not (1) demand that *the State* join in by engineering an amendment that entirely ousts the Conference from its position of control and then (2) prevent scrutiny either via a declaratory action or under the church-autonomy doctrine. Texas's constitutional guarantee that "no human authority" will improperly interfere in religious matters, Tex. Const. art. I, § 6, may not be so easily evaded.

In any event, as I discussed in Part II.A.3, *supra*, whether against the government, purely private, or some hybrid, at least in some cases

26

the exercise of judicial power itself may amply implicate the church-autonomy doctrine. *See, e.g.*, *Milivojevich*, 426 U.S. at 708. Here, SMU purported to unilaterally secede from the Conference despite being subject to its control. SMU could have brought a declaratory action *before* filing the amendments to obtain judicial approbation of its contested authority to do so. Instead of turning to the courts, however, SMU turned to the secretary of state, filing revised articles of incorporation that deleted the Conference's role and authority without its consent, and by doing so, it purported to free itself of the Conference's preexisting control. Can it really be that the church-autonomy doctrine—a fundamental precept of federal and Texas constitutional law, central to our very identity, providing a defining limit to the structure of our government, and imparting a core basis for the protection of religious self-governance—has such a gaping loophole that its evasion requires nothing more than a surreptitious filing of revisions to articles of incorporation? Can it possibly be true that what a litigator could never achieve, a transactional lawyer can do with a mere filing in the secretary of state's office? Religious liberty would be fragile indeed if SMU could so easily deprive the Conference of any way to protect its substantial rights.

The overriding question is always whether the government will protect church autonomy or whether the government will allow that autonomy to be drained away. I see no real reason why this dispute, like other cases in which private religious entities asserted conflicting secular rights, *see supra* Part II.A.3, requires any additional "government" involvement to implicate the doctrine.

**2**

One reason for that result is that this case shares the material features of a property dispute, which everyone agrees requires no distinct government involvement for civil courts to resolve. We have repeatedly stated that "courts are to apply neutral principles of law to issues such as land titles, trusts, and *corporate formation, governance, and dissolution*, even when religious entities are involved." *Episcopal Diocese of Fort Worth v Episcopal Church*, 602 S.W.3d 417, 424 (Tex. 2020) (emphasis added) (quoting *Masterson*, 422 S.W.3d at 606). We added that "specific, lawful provisions in a corporation's articles of incorporation or bylaws" will govern how a corporation, including one set up for religious purposes, "can change its articles of incorporation." *Id.* at 432 (quoting *Masterson*, 422 S.W.3d at 609). The authority to make such amendments presents "secular, not ecclesiastical, matters" unless the documents provide otherwise. *Id.* (quoting *Masterson*, 422 S.W.3d at 609).

These statements, arising from cases that turned on scrutinizing documents including articles of incorporation, are surely right. How is a dispute among religious entities about which has the right to use real property meaningfully different from a dispute about which has the right to amend (or forbid amendment of) a corporation's articles? *Someone* must have title to church property; the articles of incorporation of a Texas corporation either were validly amended, or they were not. These are not the kinds of cases that the church-autonomy doctrine bars at the courthouse door.

Of course, religious organizations are free to make *any* of these rights turn on religious questions that civil courts may not themselves

28

answer. When they do—such as by vesting title in a congregation on the condition that it remains true to a particular doctrine—the courts' work becomes more complicated. But even then, that work does not impermissibly extend to resolving the disputed religious questions; it only looks to the proper authority to provide the binding answer. In that sense, the "neutral principles" approach collapses into "deference," as in this Court's seminal decision in *Brown*. If neutral principles—*i.e.*, reading secular documents as they are usually read—themselves point to a result predicated on religious determinations, then the issue becomes ensuring that deference is properly yielded. That may sound hard, and sometimes it is. But if it can be done in a property-rights context, then I see no reason why it could not happen in a corporate-formation or corporate-governance context.

Happily, there will be no such difficulty in this case. The articles of incorporation simply state that SMU is "forever" part of the Conference's mission and under its control; they expressly forbid any amendment to the articles absent the Conference's consent. *How* the Conference chooses to exercise that control or grant that consent, or whether its decisions reflect true and pure Methodism, is wholly beside the point—those are ecclesiastical matters. The text tells us everything that civil courts need to know to assess the amendments' validity. By contrast, if the articles stated that the Conference remained in control of SMU only so long as it remained true to John Wesley's teachings, we would obviously be unable to adjudicate a challenge on the grounds that it has departed from that doctrine. Here, however, there are no religious questions to answer—only religious rights to vindicate.

Thus, I again see no real difference from property cases. The church-autonomy doctrine, at least sometimes, represents "an invitation to *churches*, where they deem it appropriate, to ask courts to assist them in resolving certain church property disputes." *McRaney*, 980 F.3d at 1071 (Ho, J., dissenting from denial of rehearing en banc) (describing the principles articulated in *Jones v. Wolf*, 443 U.S. 595, 602–04 (1979)). I agree. That "invitation" is presumably open for the defense of other kinds of rights besides claims to Blackacre.

**3**

The church-autonomy doctrine requires courts to *act* to protect church autonomy subject to the now-familiar red lines—that a "court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government." *Diocese of Lubbock*, 624 S.W.3d at 513 (citing *Westbrook*, 231 S.W.3d at 398–400). These red lines are not at issue here, which is why the church-autonomy doctrine does not bar consideration of the Conference's claim. The only question for a civil court will be whether the Conference in fact has the authority that the articles of incorporation state or if, for some other lawful reason that does not offend the church-autonomy doctrine, SMU can nonetheless dislodge it. What will play no role is whether SMU's motivation for attempting to discard the Conference's authority was noble or base, was informed by the purest religious motives or the least creditable, or was altogether uninfluenced by matters of faith.

To confirm all this, first consider whether the Conference's case against SMU requires ruling on a religious question. Though SMU's

break with the Conference may have grown from a dispute over Methodist ethics (despite the university's protests to the contrary), resolving the validity of the articles' stated ownership or control of SMU does not require selecting one exegetical approach over another, nor does it require elevating one set of beliefs over another. No court will adjudge one view of any religious question true or false.

Next ask whether resolving the case will threaten church authority to manage internal affairs. Another easy no. All parties agree that the Conference (a religious entity) owned SMU at one point in time. The merits question is whether, in light of SMU's unilateral attempt to break away from the Conference, the Conference has any recourse to maintain control over SMU. From that view of the facts and arguments, I see no way in which reaching the merits question could "*impede* the church's authority to manage its own affairs." *Diocese of Lubbock*, 624 S.W.3d at 509 (emphasis added). The opposite is true.

The case law draws a line between disputes that simply *involve* a religious entity and those that threaten "*government interference* with an internal church decision that affects the faith and mission of the church itself." *Id.* at 517 (citing *Hosanna-Tabor*, 565 U.S. at 190 (emphasis added)). The Court is therefore right to recognize that, "far from interfering with ecclesiastical matters," the exercise of our jurisdiction "respects and enforces" the Conference's choice to structure SMU under Texas corporate law. *Ante* at 10. That simple recognition makes this case unlike, say, *Diocese of Lubbock*, where civil-court second-guessing of internal church investigative procedures over clergy could have ended with a hefty monetary judgment against the Diocese and in turn imposed

31

civil coercion on it regarding how it dealt with internal disciplinary matters. *Diocese of Lubbock*, 624 S.W.3d at 517.

*   *   *

While courts should always approach questions that even implicate religious practice with great humility and self-doubt, this case is an example of when judicial *inaction* would undermine the larger principle of church autonomy. Because a court will not need to answer any religious question to decide the dispute, nor threaten to otherwise interfere with church self-governance by hearing it at all, the church-autonomy doctrine does not require dismissal. Dismissal is what would jeopardize church autonomy. Refusing to recognize the Conference's authority over SMU—or, more precisely, refusing to allow the Conference to try to prove that authority—would turn church autonomy on its head.

## III

Finally, and briefly, I turn to the question that in the end may prove most consequential: Given the Texas Constitution's distinct language and history, is its church-autonomy doctrine meaningfully different from its federal counterpart? As with other important constitutional guarantees, the answer is: "We still do not really know, even as we approach the sesquicentennial of our current Constitution." *Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 664 (Tex. 2022) (Young, J., concurring).

Like the due-course clause in § 19 of the Bill of Rights at issue in *Crown Distributing*, the freedom-of-worship provision in § 6 remains unchanged since February 15, 1876, when the Constitution took effect. Yet our church-autonomy cases are exclusively federal in character, with

32

only occasional references to our own Constitution. Chief Justice Blacklock, for example, has observed that "[b]oth the Texas Constitution and the United States Constitution compel judges to acknowledge that there are places where our imperfect judicial system does not belong, places where earthly judges have no power." *Diocese of Lubbock*, 624 S.W.3d at 520 (Blacklock, J., concurring). That case did not offer the Court any opportunity to explore how those two constitutions might differ.

Chief Justice Phillips has explained why our understanding of the Texas Constitution's religious-liberty provisions remains underdeveloped:

> Because [the relator] has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims . . . . While interesting developments are occurring in state religion clauses in other jurisdictions, we are reluctant to decide an issue as important as the scope of the Texas Constitution's free exercise guarantee under these circumstances.

*Tilton v. Marshall*, 925 S.W.2d 672, 677 n.6 (Tex. 1996) (citing Neil McCabe, *The State and Federal Religion Clauses: Differences of Degree and Kind*, 5 St. Thomas L. Rev. 49 (1992)). Nearly thirty years later, those "circumstances" are unchanged. We have not had litigants accept Chief Justice Phillips's implied invitation—one that I extend again today.

To the varying extent that the parties and amici in this case have discussed church autonomy, they (as in past cases) have proceeded as though federal law and state law are identical in their potential to protect the Conference's religious autonomy from interference. And our cases have uniformly and exclusively talked about "the First Amendment" in

33

church-autonomy contexts. *See, e.g.*, *Diocese of Lubbock*, 624 S.W.3d at 509, 512–14, 516–19 & n.3; *Episcopal Diocese*, 602 S.W.3d at 420, 424, 426–29, 431, 435; *Masterson*, 422 S.W.3d at 596, 601–03; *Pleasant Glade Assembly of God*, 264 S.W.3d at 2, 5–8, 13 (citing § 6 without discussion); *Westbrook*, 231 S.W.3d at 394–97 & n.6, 399, 400–05.

It is not *wrong*, of course, to apply the First Amendment's church-autonomy doctrine, as our cases have done. The federal Constitution binds the government of Texas, and its religious-liberty promises are fully enforceable in our courts. But church autonomy is also an independent principle arising from the *Texas* Constitution, and the federal Constitution does not limit its scope so long as it violates no federal requirements.

There is reason to think that, compared to its federal analogue, the Texas church-autonomy doctrine is *at least* as robust—and potentially far more rigorous. In relevant part, the First Amendment forbids Congress from making a law "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The soaring text of the Texas Constitution suggests an even more powerful commitment by our People to leaving the high matters of religious self-governance and doctrinal truth to religious communities:

> FREEDOM OF WORSHIP. All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. *No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion*, and no preference shall ever be given by law to any religious society or mode of worship. *But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own*

*mode of public worship.*

Tex. Const. art. I, § 6 (emphases added).

Both with respect to prohibition ("No human authority") and affirmative protection ("the duty of the Legislature"), our Constitution implies greater scope than its federal analogue. Moreover, our framers were aware of the federal Constitution. Sometimes, as with the contracts clause, they chose to copy its language almost verbatim. *See City of Baytown v. Schrock*, 645 S.W.3d 174, 183 (Tex. 2022) (Young, J., concurring). Elsewhere, as with the takings clause, our framers substantially expanded upon the federal language, presumably to generate different results. *Id.* The freedom-of-worship clause in § 6 markedly expands on its federal analogue, so it is at least plausible that the framers and ratifiers of our Constitution anticipated substantially different and more protective substantive outcomes. Particularly given that the First Amendment had not yet been incorporated against the States by 1876, the choice to not merely adopt the federal baseline but instead choose ostensibly *greater* restrictions on government in the ecclesiastical sphere should not be elided by reflexively conflating the First Amendment and § 6.

One specific potential distinction may—and I emphasize *may*—lie in the extent of the church-autonomy doctrine's jurisdictional consequences. In *Hosanna-Tabor*, for example, the Supreme Court emphasized that "the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have *no role* in filling ecclesiastical offices." 565 U.S. at 184 (emphasis added). Yet in the same case, the Court described the ministerial exception (*i.e.*, the aspect of the church-autonomy doctrine at issue) as "an affirmative defense to an otherwise cognizable claim, *not*

35

*a jurisdictional bar.*" *Id.* at 194 n.4 (emphasis added). This Court has stated that it will follow U.S. Supreme Court guidance with respect to that question—although we have read that Court's precedents more aggressively than the *Hosanna-Tabor* Court itself might have, emphasizing the clearly "jurisdiction[al]" holding in *Watson* instead. *See Diocese of Lubbock*, 624 S.W.3d at 512 n.1.

But we have not yet considered whether, wholly aside from wherever the U.S. Supreme Court leads, some matters treated as "affirmative defenses" under federal law might be "jurisdictional bars" under the Texas Constitution's more rigorous structural limitation. In other words, compared with how the U.S. Supreme Court views the First Amendment, our Constitution may more resolutely preclude courts from engaging with litigation that would risk judicial tinkering with religious decision-making. If so, there could be a heightened need for Texas courts to guard against stepping into forbidden terrain even when the parties treat it as within the civil court's domain.

Such a result would have at least two significant consequences. First, it would mean that some cases may well turn out differently under the Texas Constitution. And second, it would mean that the failure to develop the full meaning of the Texas Constitution's church-autonomy doctrine may be preventing Texas courts from obeying their mandate. While it is more than ideal for parties to develop Texas constitutional arguments within the course of litigation, and at the earliest possible stages, some requirements of our Constitution may constrain courts whether parties invoke them *or not*. *See supra* Part II.A.3 (describing why waiver and forfeiture are, at least in part, inapplicable in this context).

Given these possibilities, and looking to future cases, I therefore hope that litigants will resist the "almost routine" pattern of assuming that the protection afforded by federal and state constitutional provisions must be coterminous. *City of Baytown*, 645 S.W.3d at 184 (Young, J., concurring). It is disquieting to think that the failure to consider the vivid language in our own Constitution could lead courts to decide questions or whole cases that are beyond their authority. The sooner we have high-quality assistance, the better. I hope, therefore, that amici—like the two excellent friends of the Court that have participated in this case, and many others—along with the bar, the academy, and all other interested parties on any side, will help us determine the church-autonomy contours flowing from the original public meaning of § 6 of our Bill of Rights.

\* \* \*

To be clear, I do not purport to resolve the extent of § 6's possibly unique protections. Suspicions aside, I can only speculate that the facial textual differences between that provision and the First Amendment hint at such a delta. I remain open to any possibilities, including that, in the end, perhaps there will be no material differences between the two under current law. If, for example, the U.S. Supreme Court's religion-clause jurisprudence has expanded the First Amendment's church-autonomy scope beyond what the framers of our Constitution would have expected, then the *practical* gap between the two may have shrunk or even disappeared. But it is not at all clear that this has happened or that they are coterminous—even before taking newer provisions into account, such as § 6-a's religious-service provision, which the Court interpreted for the first time earlier this month. *See Perez v. City of San Antonio*, ___ S.W.3d ___, 2025 WL 1675639, at \*3–13 (Tex. June 13, 2025). With the benefit

of comprehensive briefing in future cases, I expect to form a firmer view.

## IV

As a formal matter, today's decision returns the case to the lower courts for further proceedings. The Court holds only that § 22.207 allows the Conference to seek a judicial interpretation about the articles of incorporation and, under the auspices of the same statute, to proceed with its contract claim. In my view, the work of the courts on remand will be quick, and I expect that the Conference's rights will be fully vindicated—if the case must proceed. In light of the Court's clarifying holding, however, I hope that it is not too late for these litigants to reconsider. Must they settle what divides them in this way rather than through some other kind of conciliation?

As my opinion today makes clear, most of those matters go beyond my authority as a judge; if the litigation must continue, so be it. I cannot help but express hope, however, that divisions of this sort can be repaired by those who once walked arm in arm in unity of purpose without recourse to the civil courts—courts that have the power to resolve disputes and vindicate rights, and that will do so to the best of the abilities of those who staff them, but that in so doing cannot help but tarnish with earthly grime what should be holy.

Evan A. Young
Justice

**OPINION FILED:** June 27, 2025

38