

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00424-CV

**UNITED METHODIST RIO TEXAS CONFERENCE BOARD OF TRUSTEES**,
Appellant

v.

**ALICE FIRST METHODIST CHURCH** f/k/a First Methodist Church of Alice, Texas; Aransas Pass Methodist f/k/a First United Methodist Church of Aransas Pass; Asbury Corpus Methodist Church f/k/a Asbury United Methodist Church; Barksdale Methodist Church f/k/a First United Methodist Church of Barksdale; First Methodist Church of Burnet Texas f/k/a First United Methodist Church of Burnet, Texas; Dewville Methodist Church f/k/a Dewville United Methodist Church; Dripping Springs Methodist Church f/k/a, Dripping Springs First United Methodist Church, Inc.; First Methodist Church of Eldorado f/k/a First United Methodist Church of Eldorado; First Methodist Church Ganado Inc.; First Methodist Church Harlingen, Texas, Inc. f/k/a First United Methodist Church of Harlingen, Texas, Inc.; Ingleside Methodist Church f/k/a Ingleside United Methodist Church, Ingleside, Texas; Karnes City Methodist Church f/k/a United Methodist Church Incorporated, Karnes City, Texas; New Life Methodist Church f/k/a First United Methodist Church of La Grange, Texas; Lampasas Methodist Church f/k/a First United Methodist Church of Lampasas, Incorporated; Lutie Watkins Memorial Methodist Church f/k/a Lutie Watkins Memorial United Methodist Church; Louise Methodist Church f/k/a Louise United Methodist Church; First Methodist Church of Lyford f/k/a First United Methodist Church of Lyford; Mertzon Methodist Church f/k/a First United Methodist Church of Mertzon, Texas; First United Methodist Church of Mission, Texas, Inc.; Raymondville Methodist Church f/k/a First United Methodist Church of Raymondville; Rio First Church f/k/a First United Methodist Church of Rio Grande City; First Methodist Church, Rocksprings, Texas f/k/a First United Methodist Church, Rocksprings, Texas; First Methodist San Saba f/k/a First United Methodist Church of San Saba; Methodist f/k/a First United Methodist Church, Inc. of Taft, Texas; First United Methodist Church, George West; Iglesia Metodista El Buen Pastor; Leakey United Methodist Church, Incorporated n/k/a Leaky Methodist Church, Incorporated; and Wesley Methodist Church of Harlingen, Texas,
Appellees

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CI09762
Honorable Laura Salinas, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:       Irene Rios, Justice
            Lori Massey Brissette, Justice
            H. Todd McCray, Justice

Delivered and Filed: October 29, 2025

AFFIRMED

Appellant United Methodist Rio Texas Conference (the "Conference") appeals the trial court's order granting the appellees' (the "local churches") plea to the jurisdiction.[1] The local churches sought to disaffiliate with the United Methodist Church ("UMC") denomination. The Conference filed suit because the local churches did not comply with the procedures and requirements outlined by the UMC's governing document, the Discipline, to disaffiliate from the UMC. In their plea to the jurisdiction, the local churches argued the dispute involves ecclesiastical matters and the courts are divested of subject matter jurisdiction to hear the case under the ecclesiastical abstention doctrine. The trial court agreed with the local churches and granted their plea to the jurisdiction.

In its first issue on appeal, the Conference argues the trial court has jurisdiction over its suit because it can apply neutral principles of law to settle the dispute without wading into the impermissible realm of ecclesiastical issues. In short, the Conference contends the ecclesiastical abstention doctrine does not divest the court of subject matter jurisdiction over this suit. In its second issue, the Conference contends that even if the ecclesiastical abstention doctrine divests the trial court of subject matter jurisdiction, the court nevertheless has jurisdiction to render

---

[1] Although the local churches' motion was titled a motion to dismiss, the substance of the motion is a plea to the jurisdiction.

judgment in the Conference's favor to enforce its decision on ecclesiastical matters because it is the higher ecclesiastical authority. We disagree on both fronts and hold the ecclesiastical abstention doctrine divests the trial court of subject matter jurisdiction to do anything other than dismiss the case. Accordingly, we affirm the trial court's order granting the local churches' plea to the jurisdiction.

## BACKGROUND

The UMC is a global religious denomination that is organized by conferences. Its organizational structure consists of several levels of conferences, each ascending with a greater geographic scope. At the lowest level is a local church. The local church is within a district conference, which is within an annual conference, which is within a jurisdictional/regional conference, which is within a general conference. "The General Conference is the [UMC's] principal governing body." *Okla. Ann. Conf. of the United Methodist Church, Inc. v. Timmons*, 538 P.3d 163, 165–66 (Okla. 2023). The appellees are all local churches, and the appellant is the annual conference covering South Texas. All the appellee local churches are within the appellant Conference's geographic region.

According to the Conference, it provides administrative services to the local churches, "including a pension and health benefits program to the clergy appointed to [the local churches], which is funded through contributions made by each [local] church" within the Conferences' region. The local churches also pay an apportionment to the Conference to support its work on the regional level and the larger UMC. The Conference "also provides access to property, liability and worker's compensation insurance for those churches within the Conference that wish to subscribe in lieu of obtaining their own insurance." Of course, the local churches pay their respective share of the premiums. According to the Conference, local churches that do not

subscribe to the insurance maintained by the Conference must obtain their own insurance coverage and name the Conference as an additional insured.

According to the Conference, the "*2016 Book of Discipline* (the 'Discipline') is 'the instrument for setting forth the laws, plan, polity, and process by which United Methodists govern themselves.'"[2] "The General Conference enacts the [Discipline], UMC's governing document." *Timmons*, 538 P.3d at 166. "The [Discipline] includes both matters of doctrine and policy, and procedures for implementing them." *Id.* Although the full text of the Discipline does not appear in the appellate record, "the general rule according to [the Discipline] is that a [local] church may disaffiliate, but UMC retains the [local] church['s] property." *Id.*

In 2019, the General Conference voted to allow ordination of pastors who were members of the LGBTQ community and recognize the ceremonial marriage of LGBTQ members within the church. According to the local churches' plea to the jurisdiction, "the [UMC] has experienced a widely publicized mass exodus of thousands of congregations in the United States who decided to disaffiliate [from the UMC] due to their religious disagreements with the [UMC's] internal affairs surrounding this topic."

The General Conference also amended the Discipline and added Paragraph 2553. The new provision created a process for local churches to disaffiliate from UMC based on disagreements regarding sexuality, while retaining their property. Under Paragraph 2553, a local church can vote to disaffiliate from the UMC. If a local church votes to disaffiliate from the UMC, the terms and conditions of the disaffiliation must be established by the board of trustees of the annual conference; here, the appellant. The terms are to be memorialized in a binding Disaffiliation

---

[2] A complete copy of the Discipline is not part of the appellate record. For this proposition, the Conference cites portions of the Discipline that are not in the appellate record.

Agreement between the Conference and the local church. However, the Disaffiliation Agreement must include the following terms:

a) Standard Terms promulgated by the General Council on Finance and Administration to protect the UMC, including a recognition and validity of Paragraph 2501, notwithstanding the release of property therefrom.[3]

b) Apportionments. The local church shall pay any unpaid apportionments for the twelve-month period prior to disaffiliation, as well as an additional twelve months of apportionments.

c) Property. A disaffiliating local church shall have the right to retain its real and personal, tangible and intangible property. All transfers of property shall be made prior to disaffiliation.

d) Pension Liabilities. The local church shall contribute withdrawal liability in an amount equal to its pro rata share of any aggregate unfunded pension obligations to the annual conference. The General Board of Pension and Health Benefits shall determine the aggregate funding obligations of the annual conference using market factors similar to a commercial annuity provider, from which the annual conference will determine the local church's share.

e) Other Liabilities. The local church shall satisfy all debts, loans, and liabilities, or assign and transfer them to its new entity, prior to disaffiliation.

f) Payment Terms. Payment shall occur prior to the effective date of departure.

g) Disaffiliating Churches Continuing as Plan Sponsors of the General Board of Pension and Health Benefits Plans. The UMC believes that a local church disaffiliating under Paragraph 2553 shall continue to share common religious bonds and convictions with the UMC based on shared Wesleyan theology and tradition and Methodist roots, unless the local church expressly resolves to the contrary. As such, a local church disaffiliating under Paragraph 2553 shall continue to be eligible to sponsor voluntary employee benefit plans through the General Board of Pension and Health Benefits under Paragraph 1504.2, subject to the applicable terms and conditions of the plans.

h) Once the disaffiliating local church has reimbursed the applicable annual conference for all funds due under the agreement, and provided that there are no other outstanding liabilities or claims against [t]he UMC as a result of the disaffiliation, in consideration of the provisions of this paragraph, the applicable annual conference shall release any claims that it may have under Paragraph

---

[3] Although it appears that Paragraph 2501 is the general provision stating UMC retains property of a disaffiliated church; this provision of the Discipline is not included in the appellate record. Thus, we are unable to review this provision of the Discipline.

2501 and other paragraphs of *The Book of Discipline of The United Methodist Church* commonly referred to as the trust clause, or under the agreement.

There was also a time limit imposed on the local churches option to disaffiliate under Paragraph 2553. According to Paragraph 2553(2): "The choice by a local church to disaffiliate with [the UMC] under this paragraph shall be made in sufficient time for the process for exiting the denomination to be complete prior to December 31, 2023. The provisions of Paragraph 2553 expire on December 31, 2023 and shall not be used after that date."[4]

All the appellee local churches voted to disaffiliate from the UMC. On April 26, 2023, the local churches advised the Conference through counsel that they did not intend to sign the Disaffiliation Agreement. Counsel further stated the local churches intend to keep their personal and real property and had no intention to pay any unfunded pension amount. "However, the churches [were] open to paying a portion of the apportionments including any owed amounts to date as part of any mutual agreement."

On May 16, 2023, the Conference sued the local churches for a declaratory judgment stating the local churches must comply with the disaffiliation procedures set forth in Paragraph 2553 of the Discipline to retain possession of their real and personal property and assets. The Conference also asserted a claim for breach of contract or anticipatory repudiation of the Discipline, namely the local churches' failure to abide by Paragraph 2553, and requested the trial court enjoin the local churches from disaffiliating without abiding by Paragraph 2553.

The local churches filed a plea to the jurisdiction arguing the trial court does not have subject matter jurisdiction over the suit pursuant to the ecclesiastical abstention doctrine because resolution of the dispute would require the trial court to interpret ecclesiastical documents and

---

[4] We question whether this appeal would be moot even if we concluded the trial court erred in denying the plea to the jurisdiction because the disaffiliation process was not completed by December 31, 2023.

entangle the courts in religious affairs. The Conference responded arguing the issues involved are not inherently ecclesiastical in nature and do not require the courts to get entangled in religious affairs. Rather, the Conference argued the court can resolve this dispute under neutral principles of law, just like it would if there were non-religious entities involved. Interestingly, the Conference argued that even if the ecclesiastical abstention doctrine divests the court of jurisdiction, the trial court should enforce the Conference's decision to bind the local churches to the disaffiliation process under Paragraph 2553 because the ecclesiastical abstention doctrine requires the courts to defer to the higher ecclesiastical body. The trial court granted the local churches' plea to the jurisdiction and dismissed the case for lack of subject matter jurisdiction. The Conference appeals.

## STANDARD OF REVIEW

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *City of San Antonio v. Rogers Shavano Ranch, Ltd.*, 383 S.W.3d 234, 241 (Tex. App.—San Antonio 2012, pet. denied). Because subject matter jurisdiction presents a question of law, we review the trial court's decision under a de novo standard of review. *Id.*

"[T]o prevail, the party asserting the plea to the jurisdiction must show that even if all the allegations in the plaintiff's pleadings are taken as true, there is an incurable jurisdictional defect apparent from the face of the pleadings, rendering it impossible for the plaintiff's petition to confer jurisdiction on the trial court." *Tex. Parks & Wildlife Dep't v. Dearing*, 150 S.W.3d 452, 457–58 (Tex. App.—Austin 2004, pet. denied). "When a defendant challenges jurisdiction, a court is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (internal quotation marks omitted).

**ECCLESIASTICAL ABSTENTION DOCTRINE**

In its first issue, the Conference contends the trial court has jurisdiction over this lawsuit because the questions of whether the local churches are bound by the Discipline's disaffiliation provisions and properly disaffiliated from the UMC can be determined by interpreting the Discipline using neutral principles of law. We disagree.

"The Free exercise clause of the First Amendment of the United States Constitution provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 601 (Tex. 2013) (quoting U.S. CONST. amend. I). "The clause severely circumscribes the role that civil courts may play in resolving church property disputes by prohibiting civil courts from inquiring into matters concerning theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Masterson*, 422 S.W.3d at 601 (internal quotation marks and citations omitted). "The First Amendment is applicable to the states through the Fourteenth Amendment." *Id.*

Attempts by courts to resolve church property disputes while balancing the competing interest of property rights and the First Amendment's Free Exercise provision have resulted in two general approaches to the issue: "the neutral principles of law" approach and the "deference" approach. *Id.* (citing *Jones v. Wolf*, 443 U.S. 595, 602–10 (1979)). Under either approach, the court may not resolve a dispute that involves "consideration of doctrinal matters, whether the ritual or liturgy of worship or the tenets of faith." *Id.* (quoting *Jones*, 443 U.S. at 602).

When confronted with an issue that potentially implicates the ecclesiastical abstention doctrine, the Texas Supreme Court held Texas courts "should use the neutral principles methodology to determine property interests when religious organizations are involved." *See*

*Masterson*, 422 S.W.3d at 607 ("Further, to reduce confusion and increase predictability in this area of the law where the issues are difficult to begin with, Texas courts must use only the neutral principles construct."). "Under the neutral principles methodology, courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions." *Id.* at 596 (citation omitted). Applying neutral principles of law to determine disputed ownership of property "will usually include considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and [bylaws], if any), and relevant provisions of governing documents of the general church." *Id.* at 603, 606 (recognizing "the differences between ecclesiastical and non-ecclesiastical issues will not always be distinct, and that many disputes [involving religious organizations] will require courts to analyze church documents and organizational structures to some degree").

"Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers." *Id.* at 605–06. In this instance, "deferring to decisions of ecclesiastical bodies in matters reserved to them by the First Amendment may, in some instances, effectively determine the property rights in question." *Id.* at 606; *see also Craver v. Faith Lutheran Church*, No. 04-22-00235-CV, 2023 WL 7365302, at *4 (Tex. App.—San Antonio Nov. 8, 2023, no pet.) ("Although wrongs may exist in the ecclesiastical setting, and although the administration of the church may be inadequate to provide a remedy, the preservation of the free exercise of religion is deemed so important a principle it overshadows the inequities that may result from its liberal application." (quoting *In re Godwin*, 293 S.W.3d 742, 748 (Tex. App.—San Antonio 2009, orig. proceeding))). "But Texas courts are bound to exercise jurisdiction vested in them by the Texas Constitution and

cannot delegate their judicial prerogative where jurisdiction exists." *Masterson*, 422 S.W.3d at 606. "Properly exercising jurisdiction requires courts to apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues." *Id.* "A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government." *In re Diocese of Lubbock*, 624 S.W.3d 506, 513 (Tex. 2021) (orig. proceeding). "Thus, courts are to apply neutral principles of law to issues such as land titles, trusts, and corporate formation, governance, and dissolution, even when religious entities are involved." *Masterson*, 422 S.W.3d at 606.

However, the "First Amendment prohibits civil courts from inquiring into matters concerning theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 435 (Tex. 2020) (internal quotation marks omitted). "It is a core tenet of the First Amendment that in resolving civil claims courts must be careful not to intrude upon internal affairs of church governance and autonomy." *Diocese of Lubbock*, 624 S.W.3d at 513.

Thus, "[i]n determining whether ecclesiastical abstention applies, courts will analyze whether a particular dispute is ecclesiastical or merely a civil-law controversy in which the church happens to be involved." *Id.* at 514. "In making this determination, we look to the substance and nature of the plaintiff's claims." *Id.* "Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed." *Id.* (citations omitted)

This court recognized, "[u]nder a plain reading, the ecclesiastical abstention doctrine would appear to apply only if claims turn on matters of religious doctrine or practice." *In re Vida*, No. 04-14-00636-CV, 2015 WL 82717, at \*2 (Tex. App.—San Antonio Jan. 7, 2015, orig. proceeding). "The Texas Supreme Court, however, has clarified that government action may burden the free exercise of religion 'by encroaching on the church's ability to manage its internal affairs.'" *Id.* (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 395 (Tex. 2007)); *see also Westbrook*, 231 S.W.3d at 397 ("Churches have a fundamental right 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" (quoting *Kedroff v. St. Nicholas Cathedral of Russion Orthodox Church in N.A.*, 344 U.S. 94, 116 (1952))). "If judicial resolution of the claim will interfere with a church's management of its internal affairs or encroach upon the church's internal governance, the court may not exercise jurisdiction over the claim." *Vida*, 2015 WL 82717, at \*2; *see also S. Methodist Univ. v. S. Cent. Juris. Conf. of the United Methodist Church*, 716 S.W.3d 475, 482 (Tex. 2025) (internal quotation marks omitted) ("To be sure, courts must be careful not to intrude upon internal matters of church governance.").

Latching on to the preclusion of court involvement in church governance, the Fort Worth Court of Appeals held the trial court lacked jurisdiction to determine whether a church conference complied with church governing documents when it seized a local church's funds and locked the members of the local church out of their place of worship. *See In re Tex. Conf. of Seventh-Day Adventists*, 652 S.W.3d 136, 141, 146–49 (Tex. App.—Fort Worth 2022, orig. proceeding) ("Whether the Conference acted in a manner consistent with the *Church Manual* is an internal matter for the Northwest Church and the Seventh-Day Adventist hierarchy to resolve."). The Fort Worth Court of Appeals determined the local church's claims were "inextricably intertwined with

matters of doctrine or church governance; because courts are prohibited from risking judicial entanglement in ecclesiastical matters, the case must be dismissed." *Id.* at 149.

Although *Masterson* indicates a court may look into some church documents to resolve purely secular questions under neutral principles of law, the local churches argue that the ecclesiastical document the court is asked to review here—the Discipline—is undoubtedly a document of church governance, thereby creating a risk of judicial entanglement in ecclesiastical matters. *See id.*; *see also Diocese of Lubbock*, 624 S.W.3d at 517 (citations omitted) ("A civil court . . . is prohibited from determining whether a church properly applied its own principles and policies, and from interfering with internal management decisions that are central to its mission . . . ."). *Cf. Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 624–25 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (determining the court could apply neutral principles of contract law to determine whether the church disparaged a former employee in violation of a non-ecclesiastical *settlement agreement* without intervening in areas traditionally held to involve religious doctrine, interpreting church governing documents, or deciding matters of the congregational or hierarchical nature of the church); *see also Diocese of Lubbock*, 624 S.W.3d at 517–18 (favorably citing *Shannon*).

Even the dissent in *Diocese of Lubbock* seems to recognize that a court's involvement with church governance crosses the line. Justice Boyd wrote: "Courts cannot resolve 'church property disputes on the basis of religious doctrine and practice.'" *Diocese of Lubbock*, 624 S.W.3d at 523 (Boyd, J., dissenting) (quoting *Jones v. Wolf*, 443 U.S. at 602). "They cannot hear 'church disputes over church polity and church administration,' or claims involving a religious organization's 'internal discipline and government.'" *Diocese of Lubbock*, 624 S.W.3d at 523 (Boyd, J.,

dissenting) (quoting *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 710, 724 (1976)).

When analyzing a materially indistinguishable issue from the one presented here, the Oklahoma Supreme Court concluded the courts did not have jurisdiction to resolve a dispute over Paragraph 2553 of the Discipline. The Oklahoma Supreme Court held:

> Where a dispute involves only narrow property issues, without any reference to religious doctrine and practice, courts may apply neutral principles of law to review language of deeds, terms of charters, church provisions concerning property ownership, and state property and trust statutes. *Jones v. Wolf*, 443 U.S. 595, 602-03, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). However, a court may not, under the neutral principles approach, decide for itself what any governing church provisions mean; the review must be strictly secular, and courts must defer to the church leadership's resolution of any religious or doctrinal question. *Id*. at 604, 99 S.Ct. 3020; *Lubbock*, 624 S.W.3d at 513. Church autonomy will apply, and a case must be dismissed, where potentially secular issues are inextricably intertwined with ecclesiastical decisions. *Lubbock*, 624 S.W.3d at 514.

*Timmons*, 538 P.3d at 168. Based on this holding, the *Timmons* court concluded:

> At issue here is whether deciding the merits of the claims of First Church requires the courts to interpret the Book of Discipline and Paragraph 2553. As the Book of Discipline is a governing church document, its interpretation is an ecclesiastical issue. All parties agree that the Book of Discipline is UMC's governing document. They also agree that Paragraph 2553 was specially adopted to address a specific ecclesiastical matter. First Church frames its lawsuit as a property issue; however, it chose to disaffiliate under the rules of church doctrine outlined in Paragraph 2553 to claim the property. First Church does not have a property dispute at this juncture, and it cannot claim to have a dispute at this juncture without confronting the doctrinal issue explicitly raised by the church-created procedural language. First Church also claims the UMC has violated its own procedures outlined in the Book of Discipline. But the only way for the courts to decide that question is, again, to interpret those internal church procedures. Under the church autonomy doctrine, courts cannot—and should not—do that.

*Id.*; *see also Ex parte Alabama-West Fla. Conf. of United Methodist Church, Inc.*, 401 So.3d 1123, 1130 (Ala. 2024) (stating the Conference sought to invoke the ecclesiastical abstention doctrine

against local churches who sought declarations over who owns the property used by the local church before it decided to disaffiliate under Paragraph 2553).[5]

We find the *Timmons* court's reasoning persuasive and note its reliance on our supreme court's holding in *Diocese of Lubbock*. This suit does not involve a dispute over who owns the real property currently occupied by the local churches. This is a dispute over whether the local churches are bound to follow the Discipline and the specific provisions providing for disaffiliation from the UMC. Although our supreme court has held courts may apply neutral principles of law to issues "such as . . . *corporate* formation, governance, and dissolution" when a religious entity has chosen to establish itself under Texas corporations law, *see S. Methodist Univ.*, 716 S.W.3d at 482 (emphasis added), it has rejected parties attempts to have the courts resolve disputes under church governing documents and regulations because such an inquiry would "intrude upon internal affairs of church governance and autonomy." *Diocese of Lubbock*, 624 S.W.3d at 513. As such, *Masterson* allows a court to look at secular documents such as a corporate governance document to resolve issues that may arise under those documents, but the ecclesiastical abstention doctrine— and broader church autonomy doctrine—precludes courts from interpreting religious documents that dictate church governance. *See id.* ("Government action that interferes with [a religious

---

[5] *Alabama-West Fla. Conf.* is procedurally different from the case at bar because the local churches sought a judicial declaration stating the Conference has no right in the local church's property before it decided to sever affiliation with the UMC without following the disaffiliation procedures in Paragraph 2553. *Ex parte Alabama-West Fla. Conf. of United Methodist Church, Inc.*, 401 So.3d 1123, 1128 (Ala. 2024). Nevertheless, the local churches disaffiliated while the suit was pending and chose not to follow the disaffiliation procedures in Paragraph 2553. *Id.* Although the Alabama supreme court held the ecclesiastical abstention doctrine did not apply in that case, it noted the local church's "complaint does not seek judicial review of the disaffiliation procedures set forth in the Book of Discipline or otherwise ask the trial court to judicially declare that [the local church's] vote to sever its affiliation with the UMC was consistent with the Book of Discipline's requirements." *Id.* at 1134. "Instead, the complaint asks that the trial court (1) recognize that [the local church] 'alone is the absolute, full, exclusive, fee simple owner of all real or personal property that is owned by [the local church], held for [the local church], or titled in its name,' (2) to declare that the UMC and the [Conference] do not have any 'trust, equitable, or beneficial interest in any of the real or personal property so owned by [the local church],' and (3) to prohibit the [Conference] and the UMC from ' taking any action that would directly or indirectly interfere with [the local church's] use, ownership, or control' of the local church property." *Id.*

- 14 -

entities' autonomy to establish and interpret its own internal rules and regulations] risks judicial entanglement with a church's conclusion regarding its own rules, customs, or laws is therefore prohibited by the First Amendment."); *see also Tex. Conf. of Seventh-Day Adventists*, 652 S.W.3d at 149.

Here, the courts cannot resolve the parties' obligations under the Discipline without interpreting that document. Although the Conference points us to isolated provisions of the Discipline that may contain contractual obligations, it is undisputed that the Discipline includes both matters of doctrine and governance. *See Timmons*, 538 P.3d at 166. Because the Discipline is a doctrinal and church governance document, judicial review and interpretation of the Discipline risks judicial entanglement with ecclesiastical matters.[6] *See Diocese of Lubbock*, 624 S.W.3d at 514 (citations omitted) ("Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed."); *Tex. Conf. of Seventh-Day Adventists*, 652 S.W.3d at 149 (holding the inquiry of whether a church Conference acted in a manner consistent with its church governing documents was an internal

---

[6] After the Texas Supreme Court issued its opinion in *Southern Methodist* earlier this year, both parties in this case filed letter briefs arguing the opinion supports their respective positions. *See generally S. Methodist Univ. v. S. Cent. Juris. Conf. of the United Methodist Church*, 716 S.W.3d 475, 482–83 (Tex. 2025). In *Southern Methodist University*, however, the court was able to analyze a purely secular document—Southern Methodist University's articles of incorporation—that happens to involve two religious entities by reviewing the articles against the backdrop of the Texas Business Organizations Code. *Id.* In contrast here, we must analyze a religious document that governs churches affiliated with the UMC and involves obligations from different vertical factions of the church. The articles of incorporation in *Southern Methodist University* were like any other non-profit corporate governing documents. The underlying basis of the articles of incorporation was purely secular to incorporate Southern Methodist University under the laws of this state, and the obligations that flow from the articles could be determined without consultation with or entanglement in ecclesiastical issues. Unlike the articles of incorporation in *Southern Methodist University*, the Discipline we are asked to review here is built upon a religious foundation and the churches' governance and obligations flow from this religious document. To exercise jurisdiction over this dispute would require the courts to meddle or intrude upon internal matters of church government. *See Diocese of Lubbock*, 624 S.W.3d at 513; *S. Methodist Univ.*, 716 S.W.3d at 482.

matter for the church hierarchy to resolve because the claims were inextricably intertwined with matters of doctrine or church governance).

This is made even more apparent when we review the Conference's "Guidelines for disaffiliation under [Paragraph] 2553" ("the Guidelines"). The Guidelines provide that when a local church considers disaffiliation under Paragraph 2553, it must enter into a period of discernment for at least six months during which "the local church/ministry shall:"

- Enter into an intentional time of prayer

- Assess the impact of their decision upon the church, community, and conference and share a written assessment with its congregation and the District Superintendent.

- Consider how the church will deal with practical concerns including, but not limited to 1) the incorporation or reincorporation of the church, 2) how designated funds and endowed funds will be handled, including notification, or if required, obtaining the consent of donors, 3) the resolution of any unpaid loans, 4) the effect of the decision, if any, on any outstanding or pending grants for ministry, 5) the source and cost of future employee health insurance, workers compensation insurance, general liability and property insurance and either tail insurance or suitable indemnification of the [Conference] for any past liabilities, 6) the process for pastoral succession going forward, and the congregation's plans if the current pastor decides not to continue with the church, and 7) continued participation in an employee or pastoral benefits plan, if any. For other considerations see the attached agreement.

- Develop and make available to the congregation and the District Superintendent a plan for either independent operation or affiliation with another denominational entity and include the theological tenets of the new entity, the governance structure, the missional goals, and anticipated costs.

- Develop a statement articulating their theological and missional foundations in seeking disaffiliation for reasons of conscience "related to human sexuality[.]"

- The local church shall hold a minimum of three listening sessions, advertised to and open to the full professing membership, at least one of which is also advertised and open to those beyond professing membership, who participate in the ministries of the church/ministry setting. These sessions shall solicit the input of these constituents and shall report their findings in the assessment referenced above. The sessions shall be facilitated by the [D]istrict [S]uperintendent or their designee. The sessions shall include a discussion of the theological and missional issues referenced above as well as the practical considerations set forth above.

It is clear that various tasks required by the Conference's disaffiliation process are ecclesiastical in nature. To name a few, the guidelines require the local churches to enter into a time of prayer, consider pastoral succession, make available to congregants a plan for denominational succession that includes the theological tenets of the new denomination, and develop a statement articulating theological and missional foundations in seeking disaffiliation for reasons of conscience related to human sexuality. Under the current framework of the ecclesiastical abstention doctrine, courts have no right to judicially compel a religious entity to perform any of these actions that are clearly of an ecclesiastical nature. We believe the Constitution prevents the courts from interfering with the local churches' decision not to follow the Conference's disaffiliation process because it is inextricably intertwined with ecclesiastical matters.

Further, accepting *arguendo* the Conference's contention that the Discipline is a binding contract between the Conference and the local churches, we note that "[c]ontract terms cannot be viewed in isolation . . . because doing so distorts meaning." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). Rather, "we must consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (internal quotation marks omitted). This requirement presents two obstacles to the Conference's position in this appeal.

First, the Conference has failed to provide an appellate record that contains the entire Discipline as written during the relevant time-period. *See Sareen v. Sareen*, 350 S.W.3d 314, 317 (Tex. App.—San Antonio 2011, no pet.) ("It is the appellant's burden to bring forward an appellate record showing reversible error by the trial court."); *Enter. Leasing Co. of Hous. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) ("[O]n appeal, [appellant in the court of appeals] bears the

burden to bring forward the record of the summary judgment evidence to provide appellate courts with a basis to review his claim of harmful error."). Thus, we are unable to consider Paragraph 2553 in harmony with the entire writing.

Second, even if the entire Discipline were in the appellate record, we would be required to analyze Paragraph 2553 in harmony with the entire document, including the ecclesiastical provisions in the Discipline. Because our canons of construction require us to read Paragraph 2553 in the context of the entire Discipline, the contested provision is inextricably intertwined with ecclesiastical matters. Therefore, it would be impossible to interpret Paragraph 2553 with neutral principles of law without also intruding into the impermissible realm of ecclesiastical matters. To do otherwise would risk the courts' entanglement in internal church affairs and cause the courts to meddle with church government. *See Diocese of Lubbock*, 624 S.W.3d at 514. Because courts cannot review the religious governing documents for compliance without running afoul of constitutional principles, we conclude the trial court properly granted the local churches' plea to the jurisdiction.

Accordingly, the Conference's first issue is overruled.

### DISMISSAL OR ENFORCEMENT

In its second issue, the Conference contends that even if the trial court is divested of subject matter jurisdiction pursuant to the ecclesiastical abstention doctrine, the court nevertheless has jurisdiction to enforce the Conferences' position because it is the higher ecclesiastical authority. It appears the Conference contends we look to neutral principles of law to resolve issues involving religious entities when possible but must defer to the higher ecclesiastical authority if the court determines it does not have jurisdiction to adjudicate the dispute.

In *Southern Methodist University*, the supreme court recently rejected this argument from a regional conference within the UMC. *See S. Methodist Univ.*, 716 S.W.3d at 483. The supreme court held that "if courts could *not* decide the case without resolving a religious question or impeding the church's authority to manage its own affairs, the result would be dismissal for lack of jurisdiction, not rendition of judgment granting the Conference (or any other party) affirmative relief." *Id.* (internal quotation marks and citations omitted). Having concluded the courts are unable to decide this case without impeding the church's authority to manage its own affairs, we have no choice but to affirm the trial court's order granting the local churches' plea to the jurisdiction and dismissing the case for lack of jurisdiction.

Accordingly, the Conferences' second issue is overruled.

CONCLUSION

We affirm the trial court's order granting the local churches' plea to the jurisdiction and dismissing this case for lack of jurisdiction.

Irene Rios, Justice
